Jose MORALES, Petitioner,

v.

Leonardo PORTUONDO, Superintendent, Shawangunk Correctional Facility, Respondent.

No. 97 CIV 2559 DC.

United States District Court, S.D. New York.

July 24, 2001.

Randa D. Maher, Great Neck, NY, Jeffrey Pittell, New York City, for Petitioner.

Robert T. Johnson, District Attorney, Bronx County by Joseph N. Ferdenzi, Cheryl D. Harris, Allen P.W. Karen, Assistant District Attorneys, Bronx, NY, for Respondent.

## OPINION

CHIN, District Judge.

The writ of habeas corpus—the "Great Writ"—has been described as the "highest safeguard of liberty." *Smith v. Bennett*, 365 U.S. 708, 712, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961). "[F]rom our very beginnings," the writ has been a powerful remedy of last resort, the "[v]indication of due process [being] precisely its historic office." *Fay v. Noia*, 372 U.S. 391, 401–02, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), *abrogated on other grounds in Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). This case serves as a reminder of its historic—and continued—importance.

Petitioner Jose Morales and his co-defendant, Ruben Montalvo, were convicted of murder in the Supreme Court of the State of New York, Bronx County, almost thirteen years ago. They have been in prison ever since.

The murder was a brutal one. A man was beaten and stabbed to death by a group of teenagers. Just days after the trial, as Morales and Montalvo were about to be sentenced, another teenager, Jesus Fornes, told at least four individuals—a priest, Montalvo's mother, Morales's attor-

ney, and a Legal Aid attorney—that he and two other individuals had committed the murder and that Morales and Montalvo were innocent.

Fornes's statements were never heard by a jury. Fornes invoked his Fifth Amendment privilege against self-incrimination and refused to testify at a post-trial hearing on a motion to set aside the verdict. The priest from whom Fornes had sought spiritual guidance did not reveal the statements because they were made as part of an informal confession. The Legal Aid attorney from whom Fornes had sought legal advice did not reveal the statements because he was prohibited by the attorney-client privilege from doing so. Although Fornes's statements to Montalvo's mother and Morales's attorney were presented to the state court at a hearing on the motion to set aside the verdict, the state court denied the motion, refusing to order a new trial because it concluded that Fornes's statements were inadmissible hearsay.

Fornes was killed in an unrelated incident in 1997. The priest and the Legal Attorney have now come forward and publicly disclosed what Fornes said to them. Fornes's statements, as conveyed to the priest, Montalvo's mother, Morales's attorney, and the Legal Aid attorney, constitute convincing evidence that Morales and Montalvo were wrongly convicted and that, indeed, they are innocent.

The Bronx District Attorney's Office now concedes that Fornes made the statements in question, but argues that Fornes was not telling the truth. It is highly unlikely, however, that Fornes would have lied to the priest or the Legal Aid attorney. He believed that both conversations were privileged and confidential and he was seeking their advice and counsel. It is also highly unlikely that he would have lied to Montalvo's mother or to Morales's attorney, for he had nothing to gain and everything to lose by telling them of his role in the murder. Fornes revealed his involvement because he was troubled that two of his friends had been wrongly convicted of a murder that he had committed. It was precisely because they were innocent that he was prepared, at least initially, to come forward and place his own liberty in jeopardy.

At the trial in 1988, only one witness placed Morales at the scene of the crime. Morales took the stand and asserted his innocence. Five other witnesses, called by the defense, testified that Morales was blocks away from the scene of the crime at or about the time of the murder. Another witness who was in the park and witnessed the murder testified that Morales and Montalvo were not there. The jury believed the prosecution's one eyewitness and rejected the testimony of the defense witnesses, but the jury surely might have reached a different result had it been told of Fornes's statements.

Morales had a right to present evidence of Fornes's statements to a jury but he was not permitted to do so. Accordingly, his right to due process of law was violated and his petition for a writ of habeas corpus is granted.

### STATEMENT OF THE CASE

#### A. The Facts

##### 1. The Murder

On September 28, 1987, Jose Antonio Rivera was murdered in the Bronx. At approximately 11 p.m., Rivera, Jennifer Rodriguez, and Rodriguez's eleven-year-old son, Cesar Montalvo ("Cesar"),[1] were walking along a street near Kelly Park.

---

1. Cesar is not related to Ruben Montalvo.

They saw a group of teenagers, at least one of whom was carrying a baseball bat or stick. There had previously been an incident between Rivera and one of the teenagers, and the teenagers approached the family.

Rivera ran. Members of the group chased and caught him. Someone struck him in the head with a stick or bat, splitting his head open. As he lay on the ground, others stabbed him and hit him again. An autopsy would later reveal that Rivera sustained "multiple lacerations of the right side of the head with brain injury and intracranial hemorrhage, two stab wounds on the back, one piercing the left kidney with abdominal hemorrhage." (Trial Tr. at 68). Rivera died from a "combination of multiple laceration[s] of the head and stab wounds with internal injury and hemorrhage." (*Id.* at 68–69).

### 2. *Morales Is Indicted, Tried, and Convicted*

No one was arrested at the scene of the murder. A few days later, Morales, who was then only 18 years old, appeared at a police station for questioning. He did so voluntarily and denied any involvement in the murder. He was placed in a lineup. Rodriguez, who had watched as her common-law husband was murdered, identified Morales as one of the assailants.

Morales was thereafter indicted, together with Montalvo and Peter Ramirez, for Rivera's murder. Morales was offered a plea bargain that would have required a prison term of only one to three years, but he rejected the offer and insisted on going to trial. (7/16/01 Hr'g Tr. at 155). In December 1988, Morales and Montalvo went to trial. In the meantime, Ramirez had committed suicide.

On December 22, 1988, the jury returned a verdict finding both Morales and Montalvo guilty of murder in the second degree.

### 3. *Fornes Comes Forward*

Shortly after Montalvo and Morales were convicted but before they were sentenced, another teenager from the neighborhood, Jesus Fornes, asked to speak to Father Joseph Towle. Fornes was approximately 17 years old at the time. Towle, a Roman Catholic priest who worked in the Hunts Point section of the South Bronx, visited Fornes in his home. Fornes told him that he was upset because two members of his group had been convicted of a murder, that the two were not present at the scene and were not involved, and that he and two others had actually committed the murder. (*Id.* at 10–11). Fornes said that one of the other two individuals was Peter Ramirez. He told Towle that he and the other two used a baseball bat and a knife to take Rivera's life. (*Id.* at 16).[2] Towle described his conversation with Fornes as follows:

> It was a heart-to-heart talk where he was feeling very badly that two of his friends had been accused and convicted of something which he had done and it was his desire to do something to make the truth appear and he wanted to make public the fact that he was responsible and they were not.

(*Id.* at 12–13). Fornes asked Towle what he should do, and Towle told him that "if he had the courage and heart to do it, that he should go to the court and that he should acknowledge that he was responsible and the others were not." (*Id.* at 13). At the end of the conversation, Towle

**2.** Towle knew all of the boys from the neighborhood; he played basketball with them and tried to minister to them. He also knew Ramirez. When Ramirez committed suicide by playing Russian Roulette, Towle "blessed his body while it was still warm." (*Id.* at 10).

granted Fornes absolution, "offer[ing] him pardon in the name of God for the things that he had done wrong." (*Id.* at 29).

### 4. *Fornes Goes To Court*

As a consequence of his conversation with Father Towle, Fornes went to see Montalvo's mother, Maria Montalvo. Fornes told her that he, Peter Ramirez, and Carlos Ocasio had committed the "killing" and that her son and Morales were not involved. (*Id.* at 109–11). Fornes told Mrs. Montalvo that he did not want Morales and Montalvo "to go to jail for something that they didn't do." (*Id.* at 112). Mrs. Montalvo immediately called her son's lawyer as well as Elizabeth Colon, Morales's mother, to tell them about her conversation with Fornes. Colon conveyed the information to her daughter, Maria Morales (now Maria Morales–Fowler). In turn, Morales–Fowler immediately relayed the information to Anthony J. Servino, Esq.

Servino had been retained, after the trial and before sentencing, to represent Morales on his appeal. When Morales–Folwer told him about Fornes, Servino said he wanted to meet with Fornes.

As was his practice when he was retained for an appeal before a defendant was sentenced, Servino went to the Bronx Supreme Court for Morales's sentencing on January 24, 1989. There, he met with members of the Morales family. As Servino was waiting for the other lawyers to arrive, Fornes appeared, unexpectedly, accompanied by his parents. Servino asked to speak to Fornes and Fornes agreed. As Servino led Fornes from the hallway into an adjoining room, Morales–Fowler overheard Fornes say to Servino, "I did the crime, I will do the time." (*Id.* at 121).

As Servino testified, Fornes told him that:

it wasn't right that Jose and R[u]ben were in [jail], they didn't do anything, I should be there.

Then he kept on repeating, I did the crime, I will do the time. They did nothing. They weren't even there. They weren't even there.

(*Id.* at 50–51). Servino believed that Fornes had come forward because of "a genuine sense or feeling of guilt that Morales and Montalvo were in there and that they shouldn't be there." (*Id.* at 51). Servino was under the impression that Fornes had appeared at the courthouse because Morales and Montalvo were scheduled to be sentenced that day and he was hoping to do something about it before they were sentenced. (*Id.* at 52).

Fornes gave Servino the following account of the murder: On the evening in question, Fornes happened upon Carlos Ocasio and Peter Ramirez near Kelly Park. The three saw Rivera, his wife, and her son across the street. When eye contact was made, Rivera pulled either a screwdriver or knife out of his pocket. The three approached and Ocasio hit Rivera in the head and the back with a baseball bat. After Rivera fell to the ground, his head split open, Fornes picked up the bat and hit Rivera in the back. Ramirez then "went crazy" and stabbed Rivera, more than once. (*Id.* at 66–70, 84).

The meeting between Servino and Fornes ended with Fornes asking "what is going to happen to me now." (*Id.* at 54). Servino responded that he did not know, but that he wanted Fornes to meet with his investigator. (*Id.*). Fornes agreed to meet with the investigator at 2:00 that afternoon at Ms. Colon's grocery store in the Bronx. (*Id.* at 74).

Servino then obtained an adjournment of the sentencing, advising the court that he would be moving to set aside the verdict based upon newly discovered evi-

dence—Fornes's statements. Servino also appeared as attorney of record for Morales, substituting for Morales's trial counsel.

### 5. *Fornes Seeks Legal Advice*

Immediately following the court proceedings, Ms. Colon reported to Servino that after the earlier meeting Fornes had told her he was not going to be at her store at 2:00. She said that Fornes had also asked, "do I need a lawyer now, do I need a lawyer now." (*Id.* at 75).

Fornes did not appear at the store at 2:00. Instead, accompanied by Father Towle and a family member, Fornes went to the Legal Aid offices on the Grand Concourse to seek legal advice. There, he met with Stanley Cohen, Esq., an attorney in the criminal defense division of the Legal Aid Society. Towle told Cohen that this was a "young man" who "felt horrible" and "had something he needed to get off his chest." (*Id.* at 89). Cohen then met with Fornes alone.

After Cohen explained the attorney-client privilege to him, Fornes told Cohen that he and two other individuals had killed someone and that the two individuals who had been convicted of the murder had not been involved. Fornes also told Cohen that he had been to court earlier that day and had spoken to a lawyer for one of the defendants. When Cohen asked Fornes why he was coming forward, Fornes replied:

I am here because I can't sleep, can't eat, no one has forced me or paid me or told me to do this, just something wrong has happened.

(*Id.* at 91). Fornes explained that he had gone into court and that he had hoped that more would have happened—he had been hoping that "people would say, okay, these two people can go home and everything will be fine." (*Id.* at 92). When Cohen

pushed him further, Fornes stated that he had not come forward earlier because he had been convinced that the other two individuals would be found not guilty—in fact, they had not been involved. He was surprised when the two were convicted. (*Id.*).

Cohen discussed Fornes's "exposure" with him. He told Fornes that he could "conceivably be throwing [his] life away" by coming forward to admit the crime, but Fornes "didn't care. He said I did it, they didn't. I should be there, not them." (*Id.* at 93). Cohen then advised Fornes as follows:

I said, look, you are 17, 18 years old, you have your entire life ahead of you. If you feel guilt, you have the priest here, you can feel guilt with the priest. It is not in your best interests to go any further.

I recall saying to him, look, you brought this information ... to someone in court that day....

I said one of the problems that you have here is [that] by going forward [you may] not end up clearing the gentlemen who ha[ve] been convicted ... but what you may end up doing is putting yourself in the middle of the case, you would end up being prosecuted, the other two who you tell me didn't do anything would not necessarily end up being released.

. . . . .

I just said I thought it was—he should not step forward, he should not answer questions and he should invoke the Fifth Amendment.

(*Id.* at 96–97).

Cohen agreed to represent Fornes. He thereafter had conversations with defense attorneys and the District Attorney's Office. He became further convinced that

because the District Attorney believed that more than two persons had committed the murder, it was conceivable that Fornes could implicate himself by coming forward without helping the two individuals who had been convicted. Hence, he continued to urge Fornes not to come forward. He also explained that it was "very, very, very difficult" to upset a verdict after trial. (*Id.* at 98).

### 6. *Fornes Takes The Fifth*

Eventually, Fornes accepted Cohen's advice. At some point, Cohen spoke to both defense counsel and the District Attorney's Office, advising them that he was representing Fornes and instructing them not to speak to Fornes.

Morales's attorney moved to set aside the verdict and a hearing was held on the motion in March 1989. Fornes followed Cohen's advice and invoked his Fifth Amendment privilege, refusing to answer questions.

### 7. *Father Towle Breaks His Silence*

In 1997, Fornes was killed, in an incident unrelated to this case.

In May 2000, Father Towle executed an affidavit in which he described the statements that Fornes had made to him some 11 or 12 years earlier. He had been corresponding with Morales in prison and Morales had described the efforts he was making to overturn his conviction. Towle began to consider whether there was some way, "within the framework of Catholic practice," for him to reveal Fornes's statements. (*Id.* at 22). Upon rethinking the matter, Towle concluded that the conversation was not a "formal confession" and that consequently, in the unique circumstances of this case, he was permitted to disclose the statements. (*Id.* at 22–23, 29–31, 41–42). If the conversation had constituted a formal confession, Towle would

never have been able to reveal any portion of it, even after Fornes's death. (*Id.* at 30).

Father Towle would later explain his delay in coming forward:

Naturally, it had taken me a long time. There is nothing I am more careful about in my whole life than the confessional secret and therefore I reflected on the basis, if there were any basis on which I could reveal the fact that ... Jesus Fornes had spoken to me, and eventually I made the judgment, yes, that I could, because I believed it was not a formal confession, and, understanding Catholic practice, I would be permitted to acknowledge that fact.

(*Id.* at 22–23). His conversation with Fornes was, as he later explained:

something that at that moment was so close if you will to a confessional matter that it was not—that was not my duty to come forward.

Now, in the course of time I have had to reflect a great deal, that is why I am here now, but at that time I think all would [have] understood that if someone were to come to a Catholic priest and to confess to a murder in a confessional situation which is between that person and God, using myself in this case as a medium, that there is nothing absolutely that I could say ever.

(*Id.* at 15–16).

Eventually, Towle executed the affidavit disclosing his conversation with Fornes. He provided a copy to Morales's attorney. Recently, Towle consulted with the Legal Department of the Archdiocese of New York and was advised that his disclosure of Fornes's statements was proper. (*Id.* at 42).

Father Towle believed Fornes's decision to come forward was:

the most heroic moment of that boy's life, the most redeeming moment of his life[,] that he was willing to step up and defend his friend[s] and to take the blame for something that they were being blamed for. It was absolutely a loyal effort to free himself of his own guilt and to save them.

(*Id.* at 19).

## B. *Prior Proceedings*

### 1. *State Court*

#### a. *The Hearing In Limine*

Prior to and intermittently during the trial, the trial court conducted a hearing to determine whether to admit into evidence statements allegedly made by Ramirez, the third individual indicted for Rivera's murder, who had killed himself prior to trial. Ramirez's mother, Rosa Lorenzi, testified that Ramirez told her that he was responsible for stabbing Rivera twice in the back. Lorenzi also testified that Ramirez told her he could not remember if there were other people in the park at the time Rivera was killed, but that Ramirez later told her he remembered that Morales and Montalvo were not in the park when Rivera was killed.

Ramirez's lawyer, Donald Yeoman, testified that Ramirez told him that as Ramirez approached Rivera in the park, Rivera was on the ground injured with a knife next to him. Yeoman further testified that Ramirez then picked up the knife, at which point Jennifer Rodriguez "jumped him from the back." (Trial Tr. at 241). Ramirez struggled with both Rivera and Rodriguez. During the scuffle, Ramirez stabbed Rivera.

Ramirez gave his attorney a list of those who were part of the group in Kelly Park at the time of the killing. Morales and Montalvo were not included in the list.

The trial court ruled that it would not permit Lorenzi or Yeoman to testify at trial as to Ramirez's alleged statements. Noting that the alleged statements were "all over the place," the trial court determined that there was no independent evidence to corroborate Ramirez's purported statements and thus precluded their admission at trial. (*Id.* at 273).

#### b. *The Trial*

##### i. *The People's Case*

At trial, the prosecution presented evidence to show that a group of teenagers—seven to eleven individuals—was at the scene of the murder and that Montalvo and Morales were both involved. Both Cesar and Rodriguez identified Montalvo and testified to his involvement. Rodriguez testified that Montalvo stabbed Rivera in the back and that Morales and Ramirez struck Rivera in the head with sticks. Rodriguez was the prosecution's only witness to implicate Morales.

A number of police officers also testified at the trial. According to their testimony, a knife, a screwdriver, and a broomstick were recovered from the crime scene. No one testified that a bat was recovered. A single latent fingerprint was lifted from the blade of the knife. The print was compared against fingerprints taken from Morales, Montalvo, Ramirez, Rivera, and two officers, but did not match any of their fingerprints.

##### ii. *The Defense Case*

Ten witnesses, including Morales, testified for the defense at trial. Their testimony showed the following:

The evening of September 28, 1987, petitioner played football with a group of friends, including Montalvo and Ramirez, on Manida Street, approximately seven to eight blocks away from the scene of the

crime. The game ended at about 9:30 p.m., and Ramirez asked Morales and Robert Melendez if they wanted to go to Beck Street with him. When asked, Ramirez told Morales he was "going to go [ ] get revenge on the man that had stabbed him." (Trial Tr. at 360). Ramirez apparently was referring to Rivera, who had been involved in an incident with Ramirez earlier in the year. Morales and Melendez declined to go with Ramirez.

Morales continued to hang out with his girlfriend, Marisol Silva, and Melendez on Manida Street. Around 10:00 p.m., Morales and Melendez went to the store owned by Morales's mother, returning to Manida Street at 10:15 p.m., where they met Silva again. At approximately 11:00 p.m., Silva was called inside her house, and Melendez and Morales started walking home. On the way, Morales threw a light bulb at a cat owned by a woman named Belinda Arroyo. Arroyo, who recalled at trial that this took place "just a little bit little after" 11:00 p.m., heard the noise and yelled at Morales from her window. (*Id.* at 294). She watched Morales and Melendez walk to the end of her block. According to Melendez, he parted company with Morales around 11:10 or 11:15 p.m.

Maria Morales–Fowler, Morales's sister, testified that Morales came home that evening shortly before 11:30 p.m. The two argued briefly because he had forgotten his keys, and Morales apparently went to bed. Both Morales–Fowler and her mother (who arrived home at 11:30 p.m.) testified that Morales did not seem nervous when they saw him.

As for Montalvo, his mother, Maria Montalvo, testified that he came home the night of September 28th between 9:30 and 9:45 p.m. Thereafter, a friend, Julio Roman, came over to watch television. According to both Maria Montalvo and Roman, Ruben Montalvo fell asleep on the couch around 10:30 p.m. and did not leave the house while either of them were there. Roman left the Montalvo residence at 1:00 a.m.

Finally, Wilson Alemany, who had been present in Kelly Park during the attack on Rivera, testified that a man had come into the park and chased after Peter Ramirez. Ramirez then started chasing the man, followed by a group of kids who had been playing football. The group eventually caught up with the man, someone hit the man in the head with a bat, and Ramirez stabbed him two times. Alemany further testified that neither Morales nor Montalvo was present in the park at the time of the murder. (*Id.* at 496).

### iii. *The Verdict*

As noted, the jury returned a guilty verdict against both Morales and Montalvo on December 22, 1988.

### c. *The Motion To Set Aside The Verdict*

Morales moved to set aside the verdict pursuant to N.Y.Crim. Proc. L. § 330.30, and Montalvo joined the motion. The trial court held a hearing on the motion on March 28, 1989. Fornes was subpoenaed, but invoked the Fifth Amendment in response to all questions.

Elizabeth Colon, Morales's mother, testified that on January 19, 1989, she received a phone call from Maria Montalvo, who told her Jesus Fornes (also known as "Chuito") had come to her home, confessed his participation in the murder, and stated that neither Morales nor Montalvo had been involved. Colon told her daughter, Maria Morales–Fowler, to inform Servino.

Servino testified to the events of January 24, 1989, when he spoke with Fornes at the courthouse prior to the scheduled sentencing. Two other attorneys for the defendants, Peter Gersten and Herman Rosen, testified as well. Gersten, counsel

for Montalvo, testified that Maria Montalvo had informed him during the trial that "Chuito" was a witness to the murder, but he had not been able to locate him. Gersten further testified that he had not learned "Chuito" was Fornes until on or before January 24th. Rosen, trial counsel for Morales, also testified that he had never heard the name of Fornes or "Chuito." Finally, Detective Walter Cullen of the NYPD testified that he had interviewed Fornes the day after Rivera's murder and that Fornes had denied witnessing the crime. On cross-examination, Detective Cullen also stated that the police had interviewed a person who identified a "Carlos" as one of Rivera's assailants.

In a written decision dated April 28, 1989, the trial court denied the motion, refusing to set aside the verdict on the grounds that Fornes's hearsay statements were uncorroborated and untrustworthy and therefore would have been inadmissible at trial. The trial court also concluded that even if Fornes's statements had been admitted at trial, they "would not in all probability have resulted in a verdict more favorable to" Morales and Montalvo. (4/28/89 Decision at 2).

### d. *The Sentence*

On May 18, 1989, Morales and Montalvo were sentenced to indeterminate terms of imprisonment of fifteen years to life.

---

**3.** With respect to Fornes's statements, the court concluded:

> Evidence that the youthful declarant lacked understanding of the disserving nature of his statements, combined with the declarant's long delay in coming forward, as well as the lack of independent evidence supporting the statements, rendered such statements inadmissible as declarations against penal interest.... [T]he trial court properly found that even if those portions of the declarant's statements that would reasonably be viewed as against penal interest had been admitted at trial, in light of the People's strong eyewitness evidence, defendant

### e. *The Appeals*

Morales appealed his conviction to the Appellate Division, First Department, on the grounds that, *inter alia*, the trial court should have admitted Ramirez's and Fornes's alleged statements into evidence and that the evidence presented at trial was not sufficient to support the verdict.

On December 5, 1991, the Appellate Division affirmed Morales's conviction. *See People v. Montalvo*, 178 A.D.2d 147, 576 N.Y.S.2d 868 (1st Dep't 1991).[3] The Court of Appeals denied petitioner's application for leave to appeal on April 7, 1992. *See People v. Montalvo*, 79 N.Y.2d 1005, 584 N.Y.S.2d 459, 594 N.E.2d 953 (1992).

### 2. *Federal Court*

On March 25, 1997, proceeding *pro se*, Morales filed his petition for a writ of habeas corpus in this Court, raising four claims: (1) the trial court improperly excluded Fornes's statements; (2) the trial court improperly excluded Rivera's statements; (3) the trial court erred in failing to suppress the identification of Morales by Jennifer Rodriguez; and (4) the evidence was insufficient to support the jury's verdict.[4]

On June 16, 1997, I dismissed the petition on the ground that it was untimely

---

> failed to show by a preponderance of the evidence that the offered new evidence would have resulted in more favorable verdicts....

576 N.Y.S.2d at 870.

**4.** Morales's co-defendant, Montalvo, filed a separate petition for a writ of habeas corpus, which was assigned to a different judge in this Court. The petition was dismissed on December 8, 1998. *See Montalvo v. Portuondo*, 1998 WL 851589, at *1, 1998 U.S. Dist. LEXIS 19137, at *2 (S.D.N.Y. Dec. 8, 1998). According to the docket sheet, judgment was entered on December 11, 1998, dismissing the peti-

under § 101 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, § 101, 110 Stat. 1214, 1217 (codified at 28 U.S.C. § 2244(d)). *See Morales v. Portuondo,* 1997 WL 433478, at \*1, 1997 U.S. Dist. LEXIS 11094, at \*1 (S.D.N.Y. June 16, 1997). In doing so, I relied on the Second Circuit's decision in *Peterson v. Demskie,* 107 F.3d 92 (2d Cir.1997), in which the Court observed that there was "no need to accord a full year after the effective date of the AEDPA" for the filing of a habeas petition. *Id.* at 93. Morales's petition had been filed 335 days after the effective date of the AEDPA and five years after his conviction had become final.

Thereafter, however, the Second Circuit decided *Ross v. Artuz,* 150 F.3d 97, 101 (2d Cir.1998), in which it concluded that its observation in *Peterson* was only dicta and held that a habeas petition was timely as long as it was filed within one year after the effective date of the AEDPA. As a consequence, on August 21, 1998, the Second Circuit vacated the judgment in this case, ruling that the petition was not time-barred and remanding the matter for further proceedings. *See Morales v. Portuondo,* 1998 WL 650816, 1998 WL 650816 (2d Cir. Aug. 21, 1998).

On remand, Morales obtained counsel, who briefed only one of the four claims raised in the petition—the claim that Ramirez's statements should have been admitted into evidence at trial. By memorandum decision dated August 11, 1999, I denied the petition, holding that the trial court did not violate Morales's constitutional rights by excluding evidence of Ramirez's statements. *See Morales v. Por-*

*tuondo,* No. 97 Civ. 2559(DC), 1999 U.S. Dist. LEXIS 12319, at \*12 (S.D.N.Y. Aug. 11, 1999). I did not address the issue of the admissibility of Fornes's statements because Morales's attorney did not raise the issue.

Morales appealed, *pro se.* The Second Circuit granted a certificate of appealability, but only on the issue of the admissibility of Fornes's statements.[5] New counsel—Randa D. Maher, Esq., one of Morales's current attorneys—was appointed to represent Morales on the appeal. Maher pressed the issue of the admissibility of Fornes's statements. Significantly, she obtained and appended to her appellate brief the affidavit from Father Towle.

After the parties argued the appeal, the Second Circuit remanded the case to this Court for supplementation of the record. Specifically, the Second Circuit directed this Court, within 120 days of its order, to make any findings of fact and conclusions of law necessary to enter judgment on the following claim: "did the state trial court violate Morales' due process rights under *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) and *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) by ruling that the post-trial statements of witness Jesus Fornes were inadmissible hearsay and insufficient to justify a new trial?" *Morales v. Portuondo,* 243 F.3d 703, 703 (2d Cir. 2001).

### C. *Pending Proceedings*

#### 1. *State Court*

On April 17, 2001, after this case was remanded by the Second Circuit, Morales,

---

tion, but Montalvo never appealed. Consequently, his conviction is not before me. Montalvo may wish to move pursuant to Fed. R.Civ.P. 60 for relief from the judgment dismissing his petition.

**5.** Apparently, someone in the Second Circuit *Pro Se* Office was diligent and astute enough to realize that the issue of the admissibility of Fornes's statements was a significant one.

acting *pro se,* filed a CPL § 440.10 motion in the Supreme Court of New York, Bronx County, to vacate the conviction on the grounds that Fornes's confession to Father Towle constituted newly-discovered evidence that would have exonerated him had it been admitted at trial. The District Attorney's Office has opposed the motion, arguing that it should be "summarily denied in its entirety, as [the] claims are procedurally barred and totally without merit." First, the District Attorney argues that Morales waited "over a year" to bring the evidence to the Supreme Court's attention. Second, the District Attorney argues that Father Towle's information is not "truly new," and that, in any event, "it would not change the result if a new trial was held" because Fornes's statements to the priest were not against his penal interest as he believed his confession would never be revealed.

The motion has not yet been heard.

### 2. *This Court*

I conducted an evidentiary hearing on July 16, 2001. Morales called five witnesses: Father Towle, Servino, Cohen, Maria Montalvo, and Maria Morales–Fowler. The District Attorney's Office called one witness, Assistant District Attorney Michael H. Cooper, who participated in an interview of Father Towle on June 18, 2001. After hearing oral argument, I reserved decision.

### DISCUSSION

The writ of habeas corpus "holds an honored place in our jurisprudence." *Engle v. Isaac,* 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). The "Great Writ" has long been "a bulwark against convictions that violate 'fundamental fairness.'" *Id. (quoting Wainwright v. Sykes,* 433 U.S. 72, 97, 97 S.Ct. 2497, 53 L.Ed.2d

594 (1977) (Stevens, J., concurring)). Its function has been to:

> provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints. Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release.... [H]abeas corpus in the federal courts provides a mode for the redress of denials of due process of law. Vindication of due process is precisely its historic office.

*Fay,* 372 U.S. at 401–02, 83 S.Ct. 822.

Here, Morales contends that he is entitled to be released because his conviction was obtained in violation of law—he was denied due process because he was not permitted to present evidence of Fornes's statements in his defense, evidence that he maintains constitutes proof of actual innocence.

Morales's petition raises several issues. First, as a threshold matter, respondent argues that Morales has not exhausted his state remedies. Second, an issue is presented as to the standard of review to be applied by a federal court reviewing a habeas petition challenging a state conviction. Third, as to the merits, Morales's contention that his due process rights were violated requires a discussion of a defendant's due process right to present evidence, the law on hearsay and privileges, and the reliability of Fornes's statements. Fourth, assuming Morales has demonstrated a violation of his constitutional rights, there remains the issue of the scope of relief.

### A. *Exhaustion*

A state prisoner who petitions for a writ of habeas corpus must exhaust his

available state court remedies by first presenting the substance of his habeas claims to the state courts. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Strogov v. Attorney Gen.*, 191 F.3d 188, 191 (2d Cir.1999), *cert. denied*, 530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000). The petitioner must present to the state courts "the same federal constitutional claim that he now urges upon the federal courts," and, if the claim is denied, he must utilize "all available mechanisms" to obtain state appellate review. *See Padilla v. Keane*, 2000 WL 1774717, at *1, 2000 U.S. Dist. LEXIS 17340, at *6 (S.D.N.Y. Dec. 4, 2000) (citation omitted); *see also Klein v. Harris*, 667 F.2d 274, 282 (2d Cir.1981).

█ Here, respondent argues that the issue of the admissibility of Fornes's statements is not properly before this Court because Morales has failed to exhaust his state court remedies. First, respondent argued on appeal to the Second Circuit that Morales never framed his claim as a federal constitutional claim in the state court proceedings and that he therefore forfeited the claim. (*See* Brief for Respondent–Appellee at 25–26). Second, respondent argues that the issue of Fornes's statements to Father Towle is not properly before this Court because Morales's motion to vacate his conviction on the basis of the statements to Father Towle is still pending in the Bronx Supreme Court. Third, respondent notes that Fornes's statements to Cohen have not been presented to the state court at all.

The exhaustion argument is rejected, for Morales has demonstrated the likelihood of a "fundamental miscarriage of justice." *Washington v. James*, 996 F.2d 1442, 1447 (2d Cir.1993) (quoting *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)); *see also* 28 U.S.C.

§ 2254(b)(1)(B)(ii) (exhaustion not required where "circumstances exist that render [the state corrective] process ineffective to protect the rights of the applicant"). In the extraordinary circumstances of this case, the interests of justice require that this Court reach the issues presented without further delay.

First, the issue of the admissibility of Fornes's statements was presented to the state courts, in the context of Fornes's conversations with Maria Montalvo and Servino. The record is unclear whether Morales couched the issue as a federal constitutional claim; neither the trial judge nor the Appellate Division addressed any federal constitutional issues. Nonetheless, the due process implications were apparent, as Morales was offering Fornes's statements as proof of actual innocence. *See Washington*, 996 F.2d at 1447 (court may excuse procedural default in failing to exhaust claim "where a constitutional violation has probably resulted in the conviction of one who is actually innocent") (quoting *Murray*, 477 U.S. at 496, 106 S.Ct. 2639). Even though they did not put a federal constitutional label on the claim, the state courts fully considered the question.

Second, the issue of the admissibility of Fornes's statements is squarely before this Court, as it was raised as one of the four grounds asserted in Morales's original *pro se* habeas petition filed in this Court. Morales's petition was filed more than four years ago. The Second Circuit specifically directed that this Court address the issue of Fornes's statements on remand, and thus the statements—at least the statements made by Fornes to Servino and Maria Montalvo—are clearly before this Court.

Third, Fornes's statements to Father Towle and Cohen are inextricably tied to the issue of the admissibility of Fornes's

statements to Servino and Maria Montalvo. At a minimum, Fornes's statements to Father Towle and Cohen are relevant as corroboration of Fornes's statements to Servino and Maria Montalvo. Moreover, the District Attorney has argued in the state court on the pending motion that Father Towle's information is not "truly new," and that, in any event, "it would not change the result if a new trial was held." Under these circumstances, the admissibility of Fornes's statements to Father Towle and Maria Montalvo should be considered together with the issue of the admissibility of the statements to Servino and Maria Montalvo.

Finally, Morales has been in prison for almost thirteen years. He has presented substantial evidence of actual innocence. If he was wrongly convicted, any further delay—no matter how brief—would only compound the fundamental unfairness of the situation.

## B. *The Standard of Review*

Prior to the enactment of AEDPA, federal courts adjudicating a habeas petition reviewed pure questions of law and mixed questions of law and fact *de novo*. *See Washington v. Schriver*, 2001 WL 674248, at *7, 255 F.3d 45, 54 (2d Cir.2001). Factual findings of the state courts were "presumed ... correct absent special circumstances listed in the [then-existing] statute." *Id.* (quoting 28 U.S.C. § 2254(d) (1994)) (internal quotation marks omitted).

AEDPA, enacted by Congress in 1996, vastly altered the landscape of habeas jurisprudence and "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The statute set forth several new standards of review, which make it more difficult for a habeas petitioner to obtain relief from a state conviction. The standard most applicable to this case provides that a habeas petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d). As the Second Circuit recently explained, "[a] state court decision is 'contrary to' Supreme Court precedent only if it either 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite result]." *Lainfiesta v. Artuz*, 2001 WL 636818, at *3, 253 F.3d 151, 155 (2d Cir. June 8, 2001) (quoting *Williams*, 529 U.S. at 405, 120 S.Ct. 1495) (alterations in original). The standards set forth by AEDPA apply to all habeas petitions filed after the statute's effective date of April 24, 1996. *See Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir.2001) (citing *Williams*, 529 U.S. at 402, 120 S.Ct. 1495).

Section 2254's requirement that petitioner's claim be "adjudicated on the merits" has caused great debate among the Courts of Appeals as to the applicability of AEDPA. *See Washington*, 2001 WL 674248, at *6–7, 255 F.3d 45, 52–54 (describing circuit split as to meaning of "adjudicated on the merits"). In *Washington*, the Second Circuit was presented with the question of whether a state court's summary dismissal of petitioner's constitutional claim qualified as "an adjudication on the merits" within the meaning of § 2254(d) and was thus subject to "AEDPA's deferent standard of review of state court determinations." *Id.* 2001 WL

674248, at *6, 255 F.3d at 52. The Court acknowledged the differing views adopted by other Circuits with respect to the phrase's definition, but ultimately declined to resolve the issue because, under either the pre- or post-AEDPA standard of review, petitioner's application for habeas relief was properly denied. *Id.* 2001 WL 674248 at *7, 255 F.3d at 54.

I likewise decline to reach the issue, as Morales is entitled to habeas relief under either standard of review. For the reasons set forth below, applying the pre-AEDPA standards, I conclude that the state court erred in holding that Fornes's statements to Servino and Maria Montalvo were inadmissible. In addition, for the reasons set forth below, applying the standards set forth in AEDPA, I conclude that the state court's decision to exclude Fornes's statements was contrary to clearly established federal law as interpreted by the Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

## C. *The Merits*

### 1. *Applicable Law*

#### a. *The Requirements of Due Process*

In *Chambers v. Mississippi*, the Supreme Court recognized that a defendant's right to present evidence at trial is a matter of due process:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.

410 U.S. at 294, 93 S.Ct. 1038; *see also Washington*, 2001 WL 674248, at *7, 255 F.3d at 54 (the "right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment") (citations omitted).

The right to present a defense, of course, is not absolute, as defendants in criminal cases "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Washington*, 2001 WL 674248, at *8, 255 F.3d at 55 (quoting *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038). On the other hand, state rules of evidence may not be "inflexibly applied" so that they deprive a defendant of a fundamentally fair trial. *See id.* Indeed, the Supreme Court held in *Chambers* that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302, 93 S.Ct. 1038.

Because the right to present a defense necessarily implicates state evidentiary rulings, federal courts considering evidentiary claims on habeas review must be careful to differentiate between mere errors of state law and those of constitutional dimension. Habeas relief under § 2254 is unavailable for mere errors of state law,' *see Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir.2000) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)), and "[e]rroneous evidentiary rulings rarely rise to the level" of a constitutional violation. *Washington*, 2001 WL 674248, at * 8, 255 F.3d at 55 (quoting *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir.1997), *rev'd on other grounds*, 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000)). Nonetheless, habeas courts confronting a Due Process claim must examine state evidentiary rulings to determine whether those rulings deprived petitioner of a fundamentally fair trial.

*See Jones,* 229 F.3d at 120; *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988) (while "erroneous evidentiary rulings do not automatically rise to the level of constitutional error, ... [t]he court's duty on a petition for habeas corpus is to determine whether the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness").

■ To obtain habeas relief on these grounds, a petitioner "must demonstrate first that the [trial court's evidentiary] ruling was erroneous and, second, that the erroneous ruling 'so infected the proceedings as to have rendered the trial fundamentally unfair.'" *Montalvo v. Newton,* No. 98 Civ. 8665(RPP)(KNF), 2001 U.S. Dist. LEXIS 3172, at *6–7 (S.D.N.Y. Mar. 22, 2001) (quoting *Alvarez v. Scully,* 833 F.Supp. 1000, 1005 (S.D.N.Y.1993)). Even if the state court's evidentiary ruling is technically correct, and the evidence would otherwise be inadmissible under the state's rules of evidence, a petitioner may nonetheless be entitled to introduce such evidence if exclusion of the evidence would render his trial fundamentally unfair. *See Chambers,* 410 U.S. at 302–03, 93 S.Ct. 1038.

■ In determining whether the exclusion of a petitioner's proffered evidence rose to the level of a constitutional violation, a habeas court must ascertain the materiality of the excluded evidence to the petitioner's defense. *See Rosario,* 839 F.2d at 925. Specifically, the Second Circuit has instructed as follows:

> Whether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." In a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." On habeas review, trial errors are subject to lenient harmless error review. The creation of otherwise non-existent reasonable doubt satisfies the "substantial and injurious" standard [of *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ].

*Jones,* 229 F.3d at 120 (citations omitted) (alterations in original). Applying these principles, I must consider whether Fornes's statements were admissible and, if so, whether their inclusion in the record would have created a reasonable doubt as to Morales's guilt.

**b. *The Hearsay Rule***

The hearsay rule prohibits the introduction of an out-of-court statement offered to prove the truth of the matter asserted; it "is based on experience and is grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Chambers,* 410 U.S. at 298, 93 S.Ct. 1038. As the Supreme Court explained:

> Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

*Id.*

**i. *Declarations Against Penal Interest***

Over the years, a number of exceptions to the hearsay rule have been developed "to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination." *Id.* at 298–99,

93 S.Ct. 1038. The declaration against penal interest is one such exception.

■ The exception for declarations against penal interest is premised upon the assumption that a person would not ordinarily make a statement that would jeopardize his interest by subjecting him to criminal prosecution and incarceration. *People v. Settles*, 46 N.Y.2d 154, 412 N.Y.S.2d 874, 882, 385 N.E.2d 612 (1978); *see Chambers*, 410 U.S. at 299, 93 S.Ct. 1038. Under New York law, a statement is admissible as a declaration against penal interest if it satisfies four elements: (1) the declarant is unavailable to testify; (2) the declarant was aware at the time he made the statement that it was contrary to his penal interest; (3) the declarant had competent knowledge of the underlying facts; and (4) there is sufficient evidence independent of the declaration to assure its trustworthiness and reliability. *See People v. Thomas*, 68 N.Y.2d 194, 507 N.Y.S.2d 973, 975, 500 N.E.2d 293 (1986); *Settles*, 412 N.Y.S.2d at 882, 385 N.E.2d 612. Although all proffered statements must meet these prerequisites, statements offered by a defendant as exculpatory evidence are held to a more lenient standard of scrutiny than those offered by the prosecution as inculpatory evidence. *See Thomas*, 507 N.Y.S.2d at 975, 500 N.E.2d 293; *People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 122, 509 N.E.2d 1226 (1987); *People v. Campney*, 252 A.D.2d 734, 677 N.Y.S.2d 393, 395 (3d Dep't 1998); *People v. Smith*, 195 A.D.2d 112, 606 N.Y.S.2d 656, 664 (1st Dep't 1994).

■ The fourth prerequisite, identified by the Court of Appeals as the most important, requires "circumstances independent of the hearsay declaration itself ... which *fairly tend to support* the assertions made and thereby assure their trustworthiness." *People v. James*, 93 N.Y.2d 620, 695 N.Y.S.2d 715, 725, 717 N.E.2d 1052 (1999) (citing *Thomas*, 507 N.Y.S.2d at 977, 500 N.E.2d 293). When the declaration against penal interest is offered by the defendant as exculpatory evidence, this prerequisite is met if there is sufficient evidence to "establish[ ] a reasonable possibility that the [declarant's] statement might be true." *Thomas*, 507 N.Y.S.2d at 977, 500 N.E.2d 293 (quoting *Settles*, 412 N.Y.S.2d at 884, 385 N.E.2d 612). In considering whether adequate indicia of reliability exist, a court should examine the circumstances surrounding the declarant's statement, including (1) the relationship between declarant and witness; (2) whether the statement was made during custodial interrogation or spontaneously to disinterested parties; (3) whether the statement was made to hurt an enemy or help a loved one; and (4) whether the declarant suffered from emotional or psychological instability or is a pathological liar. *See Brensic*, 517 N.Y.S.2d at 129, 509 N.E.2d 1226.

### ii. *The Residual Exception*

Rule 807 of the Federal Rules of Evidence provides an express "residual" exception to the rule against hearsay. It permits the introduction of out-of-court statements not specifically covered by Rules 803 and 804 that would otherwise be precluded by the hearsay rule if they have "equivalent circumstantial guarantees of trustworthiness," and certain other requirements are met. Fed.R.Evid. 807. Although no such express residual exception exists under New York law, New York courts have recently recognized a constitutionally-based exception to the hearsay prohibition for certain evidence offered by defendants in criminal cases. *See People v. Robinson*, 89 N.Y.2d 648, 657 N.Y.S.2d 575, 579, 679 N.E.2d 1055 (1997) (allowing defendant, on constitutional principles, to introduce grand jury testimony of unavail-

able witness, even though such testimony did not fall within recognized hearsay exception); *People v. James*, 242 A.D.2d 389, 661 N.Y.S.2d 273 (2d Dep't 1997) (same); *People v. Esteves*, 152 A.D.2d 406, 549 N.Y.S.2d 30, 35 (2d Dep't 1989) (recognizing that the United States Constitution may require courts to admit exculpatory hearsay statements that do not fall within any recognized hearsay exception); *see also People v. Seeley*, 186 Misc.2d 715, 720 N.Y.S.2d 315, 317 (2000) ("[a] defendant's constitutional right to present evidence that is exculpatory ... may require the admission of evidence that would ordinarily be inadmissible").

In *Robinson*, the New York Court of Appeals, citing the due process requirements described in *Chambers v. Mississippi*, permitted a criminal defendant to introduce the exculpatory grand jury testimony of an unavailable witness. *See Robinson*, 657 N.Y.S.2d at 577–78, 679 N.E.2d 1055. Acknowledging that the evidence was inadmissible under New York's "prior testimony" exception to the rule against hearsay,[6] the Court of Appeals held that the grand jury testimony could nevertheless be admitted at trial because it "me[t] certain standards of admissibility": (1) the testimony was "vital" to the defense; (2) the witness who gave the testimony was unavailable; and (3) the testimony bore suffi-

cient indicia of reliability. *Id.* at 579–81. As to the third factor, the grand jury testimony was found adequately reliable because, under the facts of the case, the prosecution "exercised its full and fair opportunity to examine the witness." *Id.* at 579.[7]

### 2. Application

In applying the law to the facts, I consider first the admissibility question: whether Fornes's statements to Maria Montalvo, Servino, Father Towle, and Cohen were admissible under the exceptions to the hearsay rule; and second the harmless error issue: whether the statements would have made a difference to the jury.

### a. Admissibility

The admissibility issue raises several layers of inquiry: whether the requirements of an exception to the hearsay rule are met; whether Fornes's statements bore sufficient indicia of reliability; whether Fornes's statements to Father Towle are blocked by the priest-penitent privilege; and whether Fornes's statements to Cohen are blocked by the attorney-client privilege.

### i. The Technical Requirements

█ Fornes's statements to Maria Montalvo and Servino meet the require-

---

**6.** CPL § 670.10 allows the admission of testimony given at prior proceedings in certain limited circumstances. Grand jury testimony does not fall within the parameters of the statute. *See Robinson*, 657 N.Y.S.2d at 578, 679 N.E.2d 1055 (citing *People v. Green*, 78 N.Y.2d 1029, 576 N.Y.S.2d 75, 581 N.E.2d 1330 (1991)).

**7.** The *Robinson* court's decision to admit the grand jury testimony rested largely on the prosecution's prior opportunity to question the witness. Although the prosecution in this case was not afforded such an opportunity, cross-examination is but one way to test trustworthiness. Here, other circumstances demonstrate trustworthiness and provide "suffi-

cient indicia of reliability." *Robinson*, 657 N.Y.S.2d at 581, 679 N.E.2d 1055. Indeed, commentators have remarked that the "trustworthiness inquiry applied to defense evidence offered as residual hearsay is not much different from the analogous requirement applied to exculpatory declarations against penal interest." Michael M. Martin, Daniel J. Capra, & Faust F. Rossi, *New York Evidence Handbook*, § 8.7, at 920 (1997). Because the circumstances in this case so overwhelmingly indicate the reliability of Fornes's statements to Father Towle and Cohen, the statements may be admitted under the rationale set forth in *Robinson*.

ments of the exception for declarations against penal interest. First, Fornes was unavailable in 1989 because he invoked his Fifth Amendment privilege against self-incrimination; he is unavailable now because he is deceased. Second, he was aware at the time he made his statements to Maria Montalvo and Servino that they were contrary to his penal interest; he was admitting his involvement to a murder and he was making the admissions to individuals he believed would take the information to the prosecuting authorities. *See Chambers*, 410 U.S. at 301, 93 S.Ct. 1038 ("McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution"). Indeed, Fornes acknowledged as much when he repeatedly told Servino, "I did the crime, I will do the time." (7/16/01 Tr. at 51).[8] Third, he had competent knowledge of the facts, as he was personally involved. Finally, as discussed below, sufficient evidence exists independent of the declarations to ensure their trustworthiness and reliability.

▮▮▮▮ Fornes's statements to Father Towle and Cohen do not qualify as declarations against penal interest, for he was not aware, when he made the statements to

them, that the statements would be against his penal interest. To the contrary, he fully expected that both Father Towle and Cohen would keep his conversations with them confidential. On the other hand, the statements to both Father Towle and Cohen (as well as the statements to Maria Montalvo and Servino) are admissible under the residual exception recognized in *Robinson* and its progeny: (1) Fornes's statements to Father Towle and Cohen are "vital" to Morales's defense; (2) Fornes was unavailable then because he invoked his privilege against self-incrimination and he is unavailable now because he is deceased; and (3) the statements bear sufficient indicia of reliability.

### ii. *The Indicia of Reliability*

Perhaps the most critical issue presented is whether Fornes's statements were trustworthy—whether he was telling the truth when he stated that he had committed the murder and that Morales and Montalvo were not involved. I conclude that Fornes's statements bore sufficient indicia of reliability and trustworthiness to make them admissible.

First, Fornes made the statements to at least four different people in four different circumstances: to Father Towle in a heart-

---

**8.** Respondent argues that, even if portions of Fornes's statements are admissible as declarations against penal interest, his assertion that Morales and Montalvo were not involved should be excluded because they do not implicate Fornes's penal interest. This contention is rejected. Although a court must "limit admissibility to those portions of [declarant's] statement which are actually self-inculpatory to the declarant," *James*, 695 N.Y.S.2d at 725, 717 N.E.2d 1052, the New York Court of Appeals has cautioned that the determination of a statement's self-inculpatory nature may "only be [reached] by viewing it in context [and] in light of all the surrounding circumstances." *Id.* (quoting with approval *Williamson v. United States*, 512 U.S. 594, 603–04,

114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)) (internal quotation marks and citations omitted). Indeed, depending on the context, "[e]ven statements that are on their face neutral may actually be against the declarant's interest." *Id.* (quoting *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431). Here, Fornes's statements exonerating Morales and Montalvo were sufficiently self-inculpatory. By asserting that the two men did not take part in the murder of Rivera, Fornes revealed his own personal knowledge of the crime. Moreover, the statements exonerating Morales and Montalvo are a critical part of the conversations because they explain his motive for coming forward and placing himself in jeopardy.

to-heart talk of a religious nature; to Maria Montalvo in her home; to Servino at the courthouse on the scheduled date of sentencing; and to Cohen at the offices of the Legal Aid Society. As the New York courts have noted, the fact that a declarant has made numerous confessions to different individuals is an "independent circumstance attesting to the trustworthiness and reliability" of declarant's statements. *See Smith,* 606 N.Y.S.2d at 663 (five confessions to two individuals); *People v. Fonfrias,* 204 A.D.2d 736, 612 N.Y.S.2d 421, 422–23 (2d Dep't 1994) (four confessions to at least four individuals).

Second, the circumstances in which Fornes made the statements strongly suggest that he was telling the truth because he had no motive to lie. At the time he approached Servino, Fornes faced no charges and was not the subject of any investigation. *Cf. Settles,* 412 N.Y.S.2d at 883, 385 N.E.2d 612 (because declarant was already subject to criminal prosecution, there was a "distinct possibility" he implicated defendant to curry favor with the district attorney's office). He had no reason to lie to Servino or Maria Montalvo; by telling them that he had committed the crime, he was exposing himself to prosecution for murder and a lengthy prison sentence. He had no reason to lie to Father Towle and Cohen because he was seeking their advice and guidance, and he had every reason to believe that his conversations with them would be kept completely confidential.

Third, the circumstances also strongly suggest that Fornes was telling the truth because he genuinely felt remorse and guilt over the fact that two friends had been unjustly convicted of a crime that he had committed. *See James,* 695 N.Y.S.2d at 727, 717 N.E.2d 1052 ("the facts and circumstances surrounding the ... statement completely rule out any motive on [declarant]'s part to falsify ... his declaration"). Unlike a co-defendant "confessing" to authorities in the hopes of receiving a lenient sentence, Fornes "was [not] using the system" here for his own gain; rather, he was "unburdening his conscience, the linchpin" of a declaration against penal interest. *People v. Blades,* 93 N.Y.2d 166, 689 N.Y.S.2d 1, 6, 711 N.E.2d 187 (1999) (internal quotation marks and citation omitted). It makes sense, as Cohen theorized, that Fornes did not come forward initially because he believed that Morales and Montalvo would not be convicted—after all, he knew they were innocent—and that when they were convicted he thought he could simply appear at their sentencing, tell the court, and clear his conscience.

Fourth, Fornes's statements were corroborated by other, independent evidence. For example, Ramirez told his mother and his attorney that he was involved in the murder and that Morales and Montalvo were not present. The prosecution's evidence at trial confirmed that Ramirez was on the scene. Fornes's statements that the third person was Carlos Ocasio and that a bat was used was corroborated by a police report indicating that a witness saw a group of youths striking a man with "bats and knives" and that one of the youths was known to him as "Carlos." Fornes's statement that Montalvo and Morales were not present was also corroborated by the defense evidence, including alibi witnesses, showing that Montalvo and Morales were somewhere other than Kelly Park at the time in question. In addition, Wilson Alemany, an eyewitness who was present in Kelly Park, testified that Montalvo and Morales were not there. Finally, a knife, screwdriver, and broomstick were recovered on the scene, but the only fingerprint found on any of the items did not match either Morales's or Montalvo's fingerprints.

Respondent argues that Fornes's statements were inconsistent with other evidence, and indeed there were some inconsistencies. But none are significant, in view of the evidence as a whole. Fornes said that three individuals were involved in the murder—himself, Ramirez, and Ocasio. The witnesses at trial testified that from seven to eleven youths were involved. Of course, it is quite likely that there were other teenagers on the scene in the park at that time, and it would have been hard for the witnesses to distinguish, at night, between those who were actually involved in the murder and those who were merely looking on.

Fornes told Servino that Ramirez "went crazy" and stabbed Rivera. The District Attorney's Office points out that the medical evidence at trial demonstrated only two stab wounds and argues that this is a significant discrepancy because Fornes's statement suggests there should have been many more stab wounds. Again, the difference is hardly significant. As Servino explained, he understood Fornes to be saying that Ramirez "went crazy" and that he then stabbed Rivera, more than once but not necessarily repeatedly. Even assuming Fornes was stating that Ramirez stabbed at Rivera repeatedly, it is possible that the stabs were not on target or that Fornes was simply wrong.

Finally, the District Attorney's Office argues that a third significant inconsistency is presented because Fornes contended that an aluminum bat was used and yet no bats were found on the scene, only a broomstick, knife, and screwdriver. Of course, it is possible that a bat was used and that someone fled with it. No one was arrested at the scene and the person who wielded the bat could have run off with it. In fact, the prosecution's own witnesses testified at trial to the use of bats in the murder. (*See* Trial Tr. at 16, 21).

Notwithstanding these inconsistencies, I conclude that sufficient indicia of reliability and trustworthiness exist to qualify Fornes's statements for admission into evidence under the exceptions to the hearsay rule. In short, there is ample evidence to show that Fornes was telling the truth. The trial court erred when it refused to order a new trial based on the evidence of Fornes's statements to Servino and Maria Montalvo. Of course, the trial court did not have the benefit of having before it the statements made to Father Towle and Cohen, but these statements only confirm the trustworthiness of what Fornes said. *See also People v. Pugh,* 258 A.D.2d 674, 686 N.Y.S.2d 764, 766 (2d Dep't 1999) (reversing conviction where trial court improperly precluded testimony of defense witness that another man had confessed to the crime); *Smith,* 606 N.Y.S.2d at 664–65 (reversing conviction where trial court improperly precluded testimony of defense witnesses that other man had confessed to crime); *Fonfrias,* 612 N.Y.S.2d at 423 (same); *People v. Fields,* 66 N.Y.2d 876, 498 N.Y.S.2d 759, 759, 489 N.E.2d 728 (1985) (affirming lower court's grant of 440.10 motion based on new evidence of another man's confession to crime).

### iii. *The Priest–Penitent Privilege*

Even assuming Fornes's statements to Father Towle fall within an exception to the hearsay rule, the issue remains as to whether the statements are nonetheless privileged as confidential communications to a member of the clergy and thus inadmissible at trial.

 Under New York law, a minister, priest, or other member of the clergy may not disclose, at trial, "a confession or confidence made to him in his professional character as spiritual advisor," absent a waiver of the privilege by the confessing person. N.Y. C.P.L.R. § 4505; *People v.*

*Carmona,* 82 N.Y.2d 603, 606 N.Y.S.2d 879, 881–82, 627 N.E.2d 959 (1993). Although the clergy-penitent privilege derives from the Catholic practice of confession,[9] it encompasses statements made to clerics of any denomination, so long as the "communication in question was made in confidence and for the purpose of obtaining spiritual guidance." *Carmona,* 606 N.Y.S.2d at 882, 627 N.E.2d 959. As the statute indicates, the privilege may be waived by the person who made the confession. For example, "voluntarily repeating the substance" of the confession to a third party constitutes a waiver of the privilege. *People v. Carmona,* 186 A.D.2d 214, 587 N.Y.S.2d 749, 750 (2d Dep't 1992).

▇ In the instant case, Fornes's statements to Father Towle arguably qualified as privileged communications under C.P.L.R. § 4505, for Fornes spoke to Father Towle "in confidence and for the purpose of obtaining spiritual guidance." *Carmona,* 82 N.Y.2d at 609, 606 N.Y.S.2d 879, 627 N.E.2d 959. Nonetheless, I hold that the statements are not rendered inadmissible by virtue of § 4505.

First, Father Towle has concluded that his conversation with Fornes was not a "formal confession," but that it was a "heart-to-heart" talk. After much deliberation, he has concluded that he was free, after Fornes died, to disclose the conversation. The Archdiocese has agreed that Father Towle acted properly in disclosing the conversation. Indeed, the Archdiocese permitted Father Towle to testify in this case and to repeat his disclosures. I am in no position to second-guess Father Towle or the Archdiocese in this respect.

Second, even assuming Fornes's statements were covered by § 4505, Fornes waived the privilege. Following his conversation with Father Towle, he disclosed at least portions of his conversation to three different people—Maria Montalvo, Servino, and Cohen. Moreover, Fornes spoke to Father Towle precisely about whether he should reveal his involvement in the crime to exculpate Morales and Montalvo. Towle told him that "if he had the courage and heart to do it, that he should go to the court and that he should acknowledge that he was responsible and the others were not." Fornes tried to do precisely that. Under these circumstances, Fornes acted in a manner "inconsistent with any desire to maintain a priest-penitent privilege," and thus he "effectively waived that privilege." *Carmona,* 587 N.Y.S.2d at 750. Accordingly, the statements to Father Towle are admissible.

### iv. *The Attorney–Client Privilege*

Likewise, even if Fornes's statements to Cohen fall within an exception to the hearsay rule, the issue remains as to whether the statements are barred by the attorney-client privilege.

▇ Communications between a person and an attorney for the purpose of rendering legal advice are privileged. *See*

9. A key element of the ritual of confession is its secrecy, known today as "the seal of confession":

 According to the Catholic Canon Law the 'sacramental seal is inviolable; it is a crime for a confessor in any way to betray a penitent by word or in any other manner or for any reason.' 1983 Code c. 983, 1, *reprinted in The Code of Canon Law* 691 (James A. Coriden *et al.,* eds.1985). If the priest reveals information obtained through confession in a way that reveals the penitent's identity, then the priest is punished by excommunication.

 Chad Horner, Note, *Beyond the Confines of the Confessional: The Priest–Penitent Privilege in a Diverse Society,* 45 Drake L.Rev. 697, 698 & n. 8 (1997). Here, of course, there was no "seal of confession."

*People v. Mitchell,* 58 N.Y.2d 368, 461 N.Y.S.2d 267, 269, 448 N.E.2d 121 (1983). Once an attorney-client relationship is established, the privilege precludes the attorney from disclosing any "confidential communication[s]" made to the attorney for the purpose of obtaining legal advice or services, in the absence of a waiver by the client. *Id.; see also* N.Y. C.P.L.R. § 4503. Such a waiver may be found where the client voluntarily discloses the communications to another party, *People v. O'Connor,* 85 A.D.2d 92, 447 N.Y.S.2d 553, 557 (4th Dep't 1982), or the communications are made in the known presence of a third party in whom the client could have no "reasonable expectation of confidentiality." *See People v. Osorio,* 75 N.Y.2d 80, 550 N.Y.S.2d 612, 615, 549 N.E.2d 1183 (1989).

■ The attorney-client privilege is personal to the client, and thus "may not be waived by the attorney after the client's death." *Martin v. John Hancock Mut. Life Ins. Co.,* 120 Misc.2d 776, 466 N.Y.S.2d 596, 598 (1983) (quoting *Matter of Trotta,* 99 Misc.2d 278, 416 N.Y.S.2d 179, 181 (1979)); *People v. Modzelewski,* 203 A.D.2d 594, 611 N.Y.S.2d 22, 22 (2d Dep't 1994) (affirming, on privilege grounds, trial court's decision to preclude defendant from calling attorney to testify regarding potentially exculpatory statements of deceased client); *see also Swidler & Berlin v. United States,* 524 U.S. 399, 410, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) ("It has been generally, if not universally, accepted, for well over a century, that the attorney-client privilege survives the death of the client in a case such as this").[10]

■ Here, Fornes's statements to Cohen were made in the course of a privileged conversation; Fornes clearly was seeking advice from Cohen as a criminal defense lawyer. Cohen specifically advised Fornes that anything he said to him would be kept confidential, and Fornes disclosed his involvement in Rivera's murder to Cohen with that understanding. Moreover, Fornes did not engage in any conduct subsequent to speaking with Cohen that could be construed as a waiver of the privilege: once Cohen advised him to invoke the Fifth Amendment, Fornes apparently stopped telling others about the murder. The fact that Fornes has died does not alter the privileged nature of the conversation, as the privilege survives his death.

Nonetheless, under the authority of *Chambers v. Mississippi,* I conclude that Fornes's statements to Cohen are admissible. As the Supreme Court held in *Chambers,* even if the evidence would otherwise be inadmissible under the state's rules of evidence, a defendant in a criminal case may nonetheless be entitled to introduce the evidence if its exclusion would render his trial fundamentally unfair. *See Chambers,* 410 U.S. at 302–03, 93 S.Ct. 1038 (holding that exclusion of hearsay statements violated due process, even though statements were not admissible under Mississippi law, which did not recognize declarations against penal interest as a exception to the rule against hearsay); *see also Priest v. Hennessy,* 51 N.Y.2d 62, 431 N.Y.S.2d 511, 514, 409 N.E.2d 983 (1980) ("even where the technical requirements of the [attorney-client] privilege are satisfied, it may, nonetheless, yield in a proper case, where strong public policy requires disclosure").

---

**10.** For one commentator's argument that a criminal defendant's Due Process rights should override the attorney-client privilege in cases where a deceased client has confessed to the crime, *see* Tyson A. Ciepluch, Comment, *Overriding the Posthumous Application of the Attorney–Client Privilege: Due Process For a Criminal Defendant,* 83 Marq. L.Rev. 785 (2000).

Fornes spoke to Cohen to obtain legal advice, but he was merely repeating what he had already told three other people, including Morales's lawyer and Montalvo's mother. Fornes wanted to continue to help Morales and Montalvo, but Cohen advised him that he would probably only hurt himself without helping Morales and Montalvo at all. Fornes was undoubtedly speaking the truth when he told Cohen that he had committed the murder and that Morales and Montalvo were not present. Fornes has been deceased for some four years now, while two apparently innocent men have spent nearly thirteen years in prison for a crime that he committed. Under these remarkable circumstances, the attorney-client privilege must not stand in the way of the truth. Fornes's statements to Cohen are admissible.

### b. *Harmless Error*

 Finally, I turn to the issue of whether the evidence of Fornes's statements would have made a difference to the jury in determining whether the prosecution had proven Morales's guilt beyond a reasonable doubt. Because the trial judge did not have the benefit of the testimony of Father Towle or Cohen, I address the harmless error question in two steps: first, by considering Fornes's statements to Servino and Maria Montalvo only; and second, by considering Fornes's statements to all four individuals together.

Considering first Fornes's statements to Mrs. Montalvo and Servino alone, I conclude that the trial court and Appellate Division erred in holding that the evidence would not have made a difference to the jury. Indeed, Morales was prevented from introducing a powerful piece of exculpatory evidence. It is likely that the omitted evidence, evaluated in the context of the entire record, would have created a "reasonable doubt that did not otherwise

exist." *See Jones*, 229 F.3d at 120 (quoting *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir.1996)).

In affirming the conviction, the Appellate Division referred to "the People's strong eyewitness evidence." *Montalvo*, 576 N.Y.S.2d at 870. The eyewitness evidence, however, consisted only of *one* witness with respect to Morales, and that witness was on the scene under circumstances that would have made it extremely difficult for her to identify anyone with any certainty. It was 11:00 at night in a park, the witness was watching as her common-law husband was being beaten and stabbed to death, and, by her own testimony, eight or nine or ten teenagers were on the scene. It would hardly be surprising if the witness made a mistake when she identified Morales in a line-up a few days later. As the Second Circuit has noted on more than one occasion, "eyewitness testimony is often highly inaccurate." *Lyons v. Johnson*, 99 F.3d 499, 504 (2d Cir.1996); *see also Kampshoff v. Smith*, 698 F.2d 581, 585–86 (2d Cir.1983) ("There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial."). One other witness, Rodriguez's son, placed Montalvo at the scene, but he did not identify Morales, nor did he actually see the beating. Moreover, he was only eleven years old at the time of the crime and only twelve years old when he testified at trial.

The trial record also contained the defense's substantial evidence that Morales and Montalvo were not present. Morales did not choose to rest on putting the prosecution to its burden of proof, but instead took the stand in his own defense. Five alibi witnesses testified that he was at or near his home seven or eight blocks away at or about the time of the murder. Although four of the witnesses were friends

or relatives of Morales, one of the witnesses was a neighbor who remembered yelling at Morales from her window shortly after 11:00 p.m. for throwing a lightbulb at her cat. Another witness, who was actually present in the park at the time of the murder, testified that Morales and Montalvo were not there.

If the statements made by Fornes to Maria Montalvo and Servino had been added to this mix, surely the jury would have found a reasonable doubt. The Second Circuit has observed that "[i]n a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Jones*, 229 F.3d at 120 (quoting *United States v. Agurs*, 427 U.S. 97, 113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)) (internal quotation marks omitted). Here, the case was a close one, and the evidence of Fornes's statements to Servino and Maria Montalvo likely would have made a difference. When Morales was denied the right to present this evidence, the erroneous evidentiary rulings rose to the level of a constitutional violation and Morales's trial was rendered fundamentally unfair.

Finally, if Fornes's statements to Father Towle and Cohen are included, it is difficult to imagine that any reasonable jury could find Morales guilty beyond a reasonable doubt. Fornes told four different people on four separate occasions under circumstances that provided considerable assurances of reliability that he was involved in the murder and that Morales and Montalvo were not. The driving force behind Fornes's decision to come forward and to place himself at risk was the guilt he felt because two innocent young men had been convicted of, and were in prison for, the crime that he committed. It is precisely this motivation that gives his statements the ring of truth, even so many years later.

In refusing to admit Fornes's statements to Servino and Maria Montalvo, the state courts failed to discuss the Supreme Court's decision in *Chambers*. The *Chambers* case is remarkably similar to this case. It involved facts "materially indistinguishable" from the facts here, and yet the state courts reached the opposite result. *See Lainfiesta v. Artuz*, 2001 WL 636818, at *3, 253 F.3d 151 (2nd Cir.2001).

In *Chambers*, the defendant was convicted of murder. At trial, the court refused to allow him to call three witnesses, each of whom would have testified that another individual, McDonald, admitted on separate occasions that he actually committed the murder. The trial court excluded the statements as hearsay and the Mississippi Supreme Court affirmed.

The Supreme Court reversed, holding that the statements, while hearsay, were made under circumstances that provided "considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. 1038. The Court held that the statements were admissible as declarations against penal interest, even though Mississippi law did not recognize such an exception to the hearsay rule. *Id.* at 300–01, 93 S.Ct. 1038. The Court reasoned that the exclusion of the testimony contributed to a denial of the defendant's right to "a trial in accord with traditional and fundamental standards of due process." *Id.* at 302, 93 S.Ct. 1038.

Likewise, here, Morales was denied "a trial in accord with traditional and fundamental standards of due process." Accordingly, his petition for a writ of habeas corpus must be granted.

### D. *Relief*

The final issue is the scope of relief. As the Supreme Court has recognized, federal courts are afforded "broad discretion" to fashion an appropriate remedy in connec-

tion with a grant of habeas relief. *See Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). The general habeas corpus statute, 28 U.S.C. § 2243, authorizes district courts to "dispose of the [habeas petition] as law and justice require." 28 U.S.C. § 2243.

Although the federal courts have the power to order immediate and unconditional release when a petitioner is held in custody illegally, the courts usually do not do so. *See Simmons v. Reynolds,* 898 F.2d 865, 869 (2d Cir.1990) (characterizing unconditional release as "an extraordinary remedy"). Instead, "[t]he typical relief granted in federal habeas corpus is a conditional order of release," directing that the prisoner be released from custody unless the state acts to legalize custody, for example, by initiating a new trial free from constitutional defect, within a reasonable period of time. *Herrera v. Collins,* 506 U.S. 390, 403, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *see also, e.g., Leka v. Portuondo,* 2001 WL 789080, at * 17, 257 F.3d 89, 107 (2d Cir.2001); *Boyette v. Lefevre,* 246 F.3d 76, 93 (2d Cir.2001); *Lindstadt v. Keane,* 239 F.3d 191, 206 (2d Cir.2001); *Durant v. Strack,* 2001 WL 726804, at *1, 151 F.Supp.2d 226 (E.D.N.Y.2001); *Noble v. Kelly,* 89 F.Supp.2d 443, 464 (S.D.N.Y. 2000), *aff'd,* 246 F.3d 93 (2001).

In other words, having concluded that Morales's petition should be granted, I have essentially two options. First, I may order his immediate and unconditional release, barring the state from re-prosecuting him. Second, in the alternative, I can grant a conditional writ, ordering the state to release Morales unless he is re-tried and convicted within a reasonable period of time. At any new trial, of course, Morales must be permitted to offer into evidence the statements Fornes made to Father Towle, Maria Montalvo, Servino, and Cohen.

The federal courts have barred retrial of successful habeas petitioners in only the rarest of circumstances. The courts have done so in three situations: (1) where the act of retrial itself would violate petitioner's constitutional right, for example, by subjecting him to double jeopardy; (2) where a conditional writ has issued and the petitioner has not been retried within the time period specified by the court; and (3) "where the petitioners had served extended and potentially unjustifiable periods of incarceration before the writ was granted." *Latzer v. Abrams,* 615 F.Supp. 1226, 1230 (E.D.N.Y.1985). In *United States ex rel. Schuster v. Vincent,* 524 F.2d 153, 154, 158 (2d Cir.1975), for example, the Second Circuit ordered the petitioner's immediate and absolute discharge where he had been confined in a state hospital for the criminally insane for 31 years without the opportunity for a sanity hearing. In fact, he had been in prison for a total of 44 years for a crime for which the average prison term was 15 years.

Finally, if I do not order immediate and absolute discharge but I grant a conditional writ instead, there remains the question of bail. Federal courts may release a habeas petitioner on bail, and even if I permit the state to re-try Morales I have the authority to grant him bail. *See* Fed. R.App. P. 23(c) ("While a decision ordering the release of a [habeas petitioner] is under review, the [petitioner] must—unless the court or judge rendering the decision ... orders otherwise—be released on personal cognizance, with or without surety."); *see also Hilton,* 481 U.S. at 774, 107 S.Ct. 2113 (stating that "Rule 23(c) undoubtedly creates a presumption of release from custody in such cases").

At the conference scheduled for 12:30 this afternoon, counsel for petitioner and respondent shall be prepared to address the issues of: (1) whether I should grant a

conditional or unconditional writ; and (2) if I grant a conditional writ, (a) the period of time I should allow for a new trial, (b) whether I should release Morales on bail pending the new trial, and (c) if I release him on bail, the terms of bail.

### CONCLUSION

The writ of habeas corpus is often requested and rarely granted. Last year, 24,945 habeas petitions were filed in the federal district courts throughout the country, and habeas petitions constitute the single largest category of civil cases filed in the federal courts.[11] The vast majority were without merit. It is easy to become disillusioned, for "prisoner actions occupy a disproportionate amount of the time and energy of the federal judiciary." *Rose v. Mitchell,* 443 U.S. 545, 584, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (Powell, J., concurring).

This case is the needle in the haystack. As Justice Frankfurter wrote, "[t]he meritorious claims are few, but our procedures must ensure that those few claims are not stifled by undiscriminating generalities." *Brown v. Allen,* 344 U.S. 443, 498, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Frankfurter, J., dissenting).

SO ORDERED.

---

**11.** Administrative Office of United States Courts, *Judicial Business of the United States Courts: 2000 Annual Report of the Director,* Table C–2A, at 139 (twelve-month period ending September 30, 2000).