Jose **MORALES**, Petitioner,

v.

Leonardo **PORTUONDO**, Superintendent, Shawangunk Correctional Facility, Respondent.

**Ruben Montalvo**, Petitioner,

v.

Leonardo Portuondo, Superintendent, Shawangunk Correctional Facility, Respondent.

Nos. 97 CIV. 2559(DC), 97 CIV. 3336(DC).

United States District Court, S.D. New York.

Sept. 27, 2001.

---

order a new trial in the face of evidence that another individual had confessed to participating in the murder and exonerated Morales and Montalvo. *See Morales v. Portuondo,* 154 F.Supp.2d 706 (S.D.N.Y. 2001). By Order dated July 27, 2001, I granted Morales's petition for a writ of habeas corpus.

As to Montalvo, I have not formally granted his habeas petition, but his circumstances are substantially similar to Morales's circumstances. *See Montalvo v. Portuondo,* No. 97 Civ. 3336(RWS), 2001 WL 856615 (S.D.N.Y. July 30, 2001). Hence, Montalvo's petition must be granted as well.

The only issue remaining as to both Morales and Montalvo is whether I should grant the writs outright or whether I should permit the District Attorney to retry them on the murder charges. The parties were given the opportunity to submit additional papers and factual materials and have done so.

In its latest submissions, the District Attorney's Office concedes—finally—that both Morales and Montalvo are entitled to have their murder convictions set aside. The District Attorney argues, however, that both Morales and Montalvo should be re-tried on the murder charges. The District Attorney writes:

> The circumstances of this case are truly unique.... Without conceding that there was legal error—and only under the remarkable circumstances presented in this case—we believe the interests of justice require a new trial.

(Resp. Mem. in *Montalvo,* at 4; *see also* Resp. Mem. in *Morales,* at 4) ("the writ should be granted only conditionally").

The District Attorney's arguments are rejected. For the reasons that follow, and in the interests of justice, Morales and Montalvo are hereby granted an uncondi-

Randa D. Maher, Esq., Great Neck, NY, Jeffrey G. Pittell, Esq., New York City, for Petitioners.

Robert T. Johnson, Esq., District Attorney, Bronx County, By Anthony J. Girese, Esq., Nancy D. Killian, Esq., Cheryl D. Harris, Esq., Assistant District Attorneys, Bronx, NY, for Respondent.

## *OPINION*

CHIN, District Judge.

In these related cases, petitioners Jose Morales and Ruben Montalvo challenge their 1988 convictions for the murder of Jose Antonio Rivera. By Opinion dated July 24, 2001 (the "Opinion"), I concluded that Morales's due process rights were violated when the trial court declined to

tional discharge: their convictions are vacated and the Bronx District Attorney's Office is ordered to take whatever steps are necessary to restore Morales and Montalvo to the status they were in prior to their arrest and prosecution in the underlying murder case.

## THE FACTS

The facts are set forth in the Opinion and the Court's prior orders. In their supplemental papers, the parties have submitted additional factual materials. The additional evidentiary materials as well as other evidence not previously discussed are summarized below.

### A. *Carlos Ocasio*

As detailed in the Opinion, Fornes told four individuals in 1988 that he and two others were involved in the murder and that Morales and Montalvo were not present. He identified the other two as Peter Ramirez, now deceased, and Carlos Ocasio.

On August 14, 2001, the District Attorney's Office interviewed Ocasio. Three prosecutors and two detectives were present. Ocasio was initially questioned for about half an hour, without a stenographer present. Eventually, he was placed under oath and examined with a stenographer transcribing the questions and answers. The transcript has been provided to the Court. Even though Ocasio was questioned about his possible involvement in a murder, he was not represented by counsel and he was not advised of his *Miranda* rights. No one was present on behalf of Morales or Montalvo.

Ocasio stated that on the evening of September 28, 1987, he was present at a pizzeria in the Bronx. He saw a group of eight to twelve individuals, including his nephew, Peter Ramirez. He heard his nephew say "we['re] going to go get him," "[t]o get the guy that stabbed me." (Oca-

sio Tr. at 6). This was approximately 15–20 minutes before Jose Rivera was stabbed. (*Id.* at 6–7).

At the interview on August 14, 2001, one of the prosecutors asked Ocasio to identify the individuals present in the pizzeria:

Q. Who did you see in the pizzeria shop with Peachy or Peter Ramirez?

A. Remembering names, I saw the guy I know as Chicky, Carlos otherwise known as Monkey, Chuito [Jesus Fornes], Peachy [Peter Ramirez] and Joey. There's just so many people. *I can't recall seeing Ruben [referring to Montalvo] or Cheo [referring to Morales] in the pizzeria.*

Q. Did you say Ruben was in the pizza shop?

A. Yes, I could be mistaken.

Q. Can you tell us if Cheo [Morales] was in the pizza shop?

A. Yes.

Q. Is that because you recall seeing them there?

A. *I can recall them eating or sitting there, but not being part of the group.*

Q. But you can say they were there?

A. Yes.

(*Id.* at 8–9) (emphasis added). Hence, Ocasio initially stated that he could not recall seeing Montalvo or Morales in the pizzeria. Then, in response to the Assistant District Attorney's leading questions, he stated that he recalled that Montalvo and Morales were present, but that they were not part of Ramirez's group. (*Id.* at 9).

Ocasio stated that he left the pizzeria, went home, and called his mother to tell her that his nephew was going to kill someone. His mother instructed him to stop the nephew. He then went to Kelly Park, but he was too late, as he saw his nephew "take the man." (*Id.* at 11). He

saw a group of about eight people taunting the man and throwing bottles at him. He saw the man pull out a knife and his nephew pull out an ice pick. He also saw others carrying bats and a couple of sticks. (*Id.* at 11–14). He eventually saw "Chuito, Carlos and Peachy" chase the man. (*Id.* at 14). Ocasio saw Chuito (Fornes) hit the man with an aluminum bat. He saw Peachy (Ramirez) stab the man twice "[a]bout his back." (*Id.* at 15–16). And he saw Carlos (Monkey) hit the man with the bat as well. (*Id.* at 16). The only three people he saw attack the victim were Chuito, Carlos, and Peachy. (*Id.* at 16–17).

Ocasio also stated that he did not see Cheo (Morales) or Ruben (Montalvo) after the pizzeria or at the scene of the crime. (*Id.* at 27, 28, 29).

In its papers, the District Attorney's Office contends that Ocasio stated in his interview that "a group of 12–13 people had been present at a pizzeria at 10:45 p.m. that night, including [Montalvo] and ... Morales, when Ramirez announced that he was going to 'get' Mr. Rivera," and that in the park "10–12 people began to chase Mr. Rivera, and that group may or may not have included [Montalvo] and ... Morales." (Harris 8/20/01 Aff. in *Montalvo*, ¶ 34). The purported description of Ocasio's testimony mischaracterizes what he said. First, Ocasio testified initially, "I can't recall seeing Ruben or Cheo in the pizzeria." (Ocasio Tr. at 8). It was only when the prosecutor followed up by asking Ocasio (incorrectly, according to the transcript) "[d]id you say Ruben was in the pizza shop?" that Ocasio said "[y]es, I could be mistaken." (*Id.*). Second, although Ocasio did eventually say that Montalvo and Morales were both present in the pizzeria, he also clearly said that the two were *not* part of Ramirez's group in the pizzeria: "I can recall them [Morales and Montalvo] eating or sitting there, but

not being part of the group." (*Id.* at 9). Third, notwithstanding the District Attorney's Office's suggestions otherwise, Ocasio was unequivocal in his recollection that he did not see Morales and Montalvo in the park, as he testified as follows:

Q. Did you see where Cheo and Ruben went after the pizzeria?

A. I didn't.

Q. You can't say?

A. No.

. . .

[Q.] Did you see where Cheo and Ruben went after they left the pizzeria?

A. No, I didn't. You asked me that.

Q. Could you say you saw them, you didn't see them or you don't know? What did you see of them after you left the pizzeria and came back?

A. When I left the pizza shop, when I saw them, they were inside sitting down.

I walked out the pizza shop, and I didn't say hi to them, stood in front and told my nephew what I was going to do.

I went home and they told me not to do nothing and they told me not to stay.

Q. Peachy told you to go home?

A. Yes, he don't want me involved, so I went home.

What I seen, I left them inside the pizzeria shop while everybody was outside the pizza shop. There were around eight guys outside while the rest were inside.

Q. The total maybe thirteen people?

A. Yeah. I went home and I didn't see nothing else. I went from the pizza shop home . . . .

I came back down like that when I see him and I was behind Peachy and these guys also already coming. I didn't see. They could have been back there, but I'm not saying that they were.

Q. Just to be clear, Cheo and Ruben could have been or not, but you can't say, you didn't see?

A. At any time I didn't see.

(*Id.* at 27–29). Hence, the Assistant District Attorney asked Ocasio *five* times whether he saw where Morales and Montalvo went after the pizzeria, *i.e.*, whether he saw them in the park. The first three times, Ocasio unequivocally stated that he did not see them after he left the pizzeria. The fourth time, in the course of a narrative answer, Ocasio stated, in essence, that although he did not see them after the pizzeria, it was possible that they were in the park and he did not see them—but he was not saying that they were there. The fifth time he reiterated that he "didn't see." From this testimony, the District Attorney's Office somehow concludes that Ocasio testified that the group of people that chased Rivera "may or may not have included" Morales and Montalvo.

Back in 1987, two days after the murder, Ocasio spoke to an investigator who was looking for Ramirez. Ocasio did not tell the investigator what he knew about the murder because the investigator did not ask him to do so. (*Id.* at 20). Ocasio was apparently not contacted by any investigators again, until just this summer.

**B.  *Jennifer Rodriguez***

As previously noted, only two witnesses at trial placed petitioners at the scene of the crime. Only one, the victim's common-law wife, Jennifer Rodriguez, identified Morales. She also identified Montalvo. The other witness, Rodriguez's son, was 11 years old at the time of the attack, and he identified only Montalvo.

Although I did not mention this in the Opinion, the evidence at trial demonstrated that Rodriguez had been drinking at a bodega with the deceased shortly before the attack. (Trial Tr. at 127, 168–69).

Moreover, the additional evidentiary materials show that at the time of the trial, there were criminal charges pending against Rodriguez for criminal possession of a controlled substance in the Criminal Court in the Bronx, for which she had been arrested on August 10, 1988. (*See* Harris 8/29/01 Aff. in *Morales*, ¶ 4 & Ex. 2). In fact, at the time the information was requested, December 5, 1988 (just a few days before trial), an "active" warrant was outstanding for Rodriguez's arrest. (*Id.*, ¶ 3, Ex. 1, Ex. 2). Petitioners contend that the prosecution failed to disclose this information to their trial lawyers, as required by New York Criminal Procedure Law § 240.45(1)(c), but provide no affidavits from trial counsel to that effect. One of petitioners' lawyers does represent that he received the "trial file" from petitioner's prior counsel, and the trial file does not contain a copy of Rodriguez's criminal history. (Pittell 8/30/01 Reply Aff. in *Morales*, ¶ 2).

The District Attorney's Office concedes that it did have the information prior to trial, but it does not affirmatively state that it disclosed the information to defense counsel. (Harris 8/29/01 Aff. in *Morales*, ¶¶ 3, 4 & Ex. 1; Resp. Reply Mem. in *Morales* at 9). No affidavit attesting to disclosure has been provided by Assistant District Attorney Allen Karen, who tried the case and requested the records on December 5, 1988, and no copy of any transmittal letter disclosing the information has been produced. Rather, the District Attorney's Office simply notes that copies of the report "would" have been turned over to defense attorneys "[i]n the normal course of business." (Resp. Reply Mem. in *Morales* at 6).

At trial, Rodriguez was cross-examined on the use of drugs; she denied ever using "heroin or cocaine or anything like that." (Trial Tr. at 167). Neither defense counsel

cross-examined her on the then-pending drug charges; presumably, had they known about the charges, they would have pressed Rodriguez on whether she was lying in denying that she had ever used drugs, on whether she was under the influence of drugs on the night of the attack, and on whether the pendency of charges against her brought by the same District Attorney's Office that was prosecuting the case on trial affected her testimony in any way. In addition, the trial transcript demonstrates that the Assistant District Attorney did not disclose the fact of the pending drug possession charges to the Court or defense counsel, even when Rodriguez denied that she had ever used drugs.

On the basis of (1) the absence of any copy of Rodriguez's criminal history in defense counsel's "trial file," now in the possession of petitioners' current attorneys, (2) the absence of any discussion on the record before or during the trial of the charges then-pending against Rodriguez, (3) the absence of any cross-examination of Rodriguez at trial about the charges, and (4) the absence of any affirmative proof from the District Attorney's office that disclosure was made, I can only conclude that the District Attorney's Office did not disclose the information to defense counsel at trial, as required by the New York Criminal Procedure Law.

The records also show that Rodriguez was arrested as well in 1994, 1995, 1996, and 1997. (Maher 8/20/01 Aff. in *Montalvo*, Ex. E). It is unclear from the materials before the Court how many of these arrests resulted in convictions. Petitioners' counsel contends that Rodriguez was convicted in 1997 for criminal sale of crack cocaine. (*See* Pet. Mem. in *Morales* at 13).

Finally, the trial transcript shows that Rodriguez was, to say the least, less than sure in her identification of Morales and Montalvo. For example, on direct examination, she testified that Montalvo grabbed her son on the night in question. (Trial Tr. at 117). Yet, she testified on cross-examination as follows:

Q. Where was Mr. Morales?

A. Mr. Morales grabbed my son.

Q. Mr. Morales grabbed your son. I thought you testified that Mr. Montalvo grabbed your son?

A. I am sorry, you confuse me, all right. Montalvo, I know that he is the one that grabbed my son. You confuse me. He is the one and he is the one that hit him with the stick.

(*Id.* at 133).

At trial, Rodriguez testified that she had never seen Montalvo before the night in question, when he grabbed her son. (*Id.* at 184). Yet, she had testified at a hearing the week before trial that when Montalvo grabbed her son, she "recognize[d] him at that time from seeing him two weeks before." (*Id.* at 189). There were other inconsistencies in her testimony as well. (*See, e.g., id.* at 140–41, 179–82, 200–02, 209–10, 219–21).

Finally, on October 3, 1987, approximately a week before Rodriguez identified Montalvo in a lineup, the deceased's sister, Aurelia Betances, showed Rodriguez a photograph of Montalvo while they were taking a cab to the police station. At the police station the photograph was shown to a detective, who then took out his own photograph of Montalvo and showed it to Rodriguez as well. (*See* Trial Tr. 435–37; *see also* Pet. Mem. in *Montalvo*, at 15).

## C. Other Witnesses

The District Attorney's Office submitted affidavits recently obtained from two other witnesses to the attack. One saw "6 or 7 young Spanish guys, between the ages of 18 and 21," chasing the victim. (Green Aff.). The other saw "5 or 6 young male

Hispanics, between the ages of 18 and 19," chasing the victim. (Martinez Aff.). Neither is able to identify any of the attackers. The identities of both these witnesses, as well as a third, were known to the police officers at the time of the attack. The three witnesses patrolled the area with two detectives in an attempt to identify the perpetrators, but the results were negative. There is nothing in the record to suggest that these witnesses were shown any photographs or viewed any line-ups.

At trial in 1988, the defense called Wilson Alemany, who testified that Morales and Montalvo were not present in the park. Alemany is now deceased.

Petitioners' counsel also represent that the whereabouts of Donald Yeoman, Esq., are unknown. In 1988, Yeoman represented Ramirez. After Ramirez's death, Yeoman testified at a hearing that Ramirez had told him that Morales and Montalvo were not present at the scene of the crime.

### D. *Documentary Evidence*

Petitioners have submitted unredacted materials recently produced by the District Attorney's Office. These materials include the following:

An unredacted page from a memo book of an interview apparently conducted on September 29, 1987, shows that law enforcement was aware of Carlos Ocasio and had an address for him at that time. Apparently, only a redacted version was provided to defense counsel at the time of the trial, and Ocasio's name and address had been redacted. (Pittell Reply. Aff. in *Morales,* Ex. C).

Another unredacted page from a different memo book containing notes of an interview of Rosa Lorenzi, Peter Ramirez's mother, also refers to Carlos Ocasio and states that although Ocasio was in Puerto Rico at that time, he could be produced "at any time." (*Id.,* Ex. D). Apparently, only a redacted version was provided to defense counsel at the time of trial; Ocasio's name was deleted. (*Id.*).

Another unredacted page from a different memo book contains notes of an interview of Jesus Fornes. The notes refer to "Uncle Carlos Ocasio" and show that Fornes stated that he was with "Carlos & Peachie," apparently at his home around 10:30, that they then went to a pizza shop, and that they then went back to his home. (*Id.,* Ex. G). Apparently, only a redacted version was provided to defense counsel at trial; the references to Fornes, his address, and "Uncle Carlos Ocasio" were deleted. (*Id.*). The unredacted page apparently was not made available to defense counsel at the time of the original motion for a new trial; if it had been produced in unredacted form, it would have provided some corroboration for Fornes's statement that he committed the murder with Peachie and a "Carlos," for he told the investigator that he was with "Carlos & Peachie" during the entire time in question.

In addition, petitioners also submitted a police report that shows that Jennifer Rodriguez stated that there were three perpetrators, three male Hispanics. (Maher Aff. in *Morales,* Ex. A). Another police report, dated September 29, 1987, also states that the victim had been stabbed numerous times by "3 hispanic youths." (*Id.,* Ex. C).

### E. *Petitioners*

Both Morales and Montalvo were sentenced to terms of imprisonment of 15 years to life. They had served almost 13 years of their sentences when they were recently released on bail.

While in prison, Morales earned an Associate of Liberal Arts degree from Ulster Community College, where he was on the

608

Dean's List for several semesters. He has also worked towards a Bachelor of Arts degree from SUNY New Paltz. He has received vocational training in building maintenance and has earned a legal research certificate. He was 17 years old when he was convicted in 1988. He has a son who is now 12 years old.

Montalvo likewise made substantial efforts to educate himself while in prison. He earned a high school equivalency degree. He received certifications in various vocational training programs, including welding, wood working, furniture upholstery, and custodial maintenance. He was the editor of the newspaper at his facility. He was certified as a sighted guide for assisting blind inmates. He enrolled in a number of educational and therapeutic programs and earned certificates of proficiency as a teacher's aide, tutor, or counselor in many of the programs. He was 18 years old when he was convicted in 1988. He has a daughter who is now 12 years old.

## DISCUSSION

The District Attorney's Office, while refusing to concede "legal error," acknowledges that petitioners' convictions must be vacated. It argues, however, that the proper remedy is a new trial where the eyewitness testimony of Cesar Montalvo and Jennifer Rodriguez and the "forensic evidence" can be "weighed" against the evidence offered by petitioners, and new evidence such as Ocasio's testimony can be presented to the jury as well. (Resp. Mem. in *Montalvo* at 4–5). Petitioners argue that the writs should be granted unconditionally, and that the District Attorney should be barred from re-trying them. Hence, I must decide whether to grant the writs conditionally, in which case the state would be permitted to re-try Morales and Montalvo within a reasonable period of time, with Morales and Montalvo having the ability to offer into evidence the statements made by Fornes as well as the additional evidence discussed above, or unconditionally, in which case the state would be barred from re-trying Morales and Montalvo.

### A. Applicable Law

As the Supreme Court has recognized, federal courts are afforded "broad discretion" in fashioning an appropriate remedy when granting a writ of habeas relief. *See Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). The general habeas corpus statute, 28 U.S.C. § 2243, authorizes district courts to "dispose of the [habeas petition] as law and justice require." 28 U.S.C. § 2243.

This authority gives a district court discretion "to preclude a state from retrying a successful habeas petitioner when the court deems that remedy appropriate." *Foster v. Lockhart,* 9 F.3d 722, 727 (8th Cir.1993); *accord Capps v. Sullivan,* 13 F.3d 350, 352 (10th Cir.1993) ("barring a new trial [following the grant of a habeas petition] is a permissible form of judgment"); *Burkett v. Cunningham,* 826 F.2d 1208, 1226 (3d Cir.1987) (unconditional release ordered where "no relief short of discharge could fully remedy [constitutional] violations"). Unconditional release, however, is a remedy rarely granted. *See Cody v. Henderson,* 936 F.2d 715, 719 (2d Cir.1991) ("unconditional release from custody is not an appropriate remedy" unless petitioner can show "substantial prejudice"); *Simmons v. Reynolds,* 898 F.2d 865, 869 (2d Cir.1990) (characterizing unconditional release as "an extraordinary remedy"). Instead, "[t]he typical relief granted in federal habeas corpus is a conditional order of release," directing that the prisoner be released from custody unless the state acts to legalize custody, for

example, by initiating a new trial free from constitutional defect, within a reasonable period of time. *Herrera v. Collins,* 506 U.S. 390, 403, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *see also, e.g., Leka v. Portuondo,* 257 F.3d 89, 107 (2d Cir.2001); *Boyette v. Lefevre,* 246 F.3d 76, 93 (2d Cir.2001); *Lindstadt v. Keane,* 239 F.3d 191, 206 (2d Cir.2001).

The federal courts have barred retrial of successful habeas petitioners in only the rarest of circumstances. The courts have done so in three situations: (1) where the act of retrial itself would violate petitioner's constitutional rights, for example, by subjecting him to double jeopardy; (2) where a conditional writ has issued and the petitioner has not been retried within the time period specified by the court; and (3) "where the petitioners had served extended and potentially unjustifiable periods of incarceration before the writ was granted." *Latzer v. Abrams,* 615 F.Supp. 1226, 1230 (E.D.N.Y.1985); *see, e.g., United States ex rel. Schuster v. Vincent,* 524 F.2d 153, 154, 158, 162 (2d Cir.1975) (ordering petitioner's immediate and absolute discharge where he had been confined in state hospital for 31 years without opportunity for sanity hearing and he had been in prison for total of 44 years for crime for which average prison term was 15 years).

**B.  *Application***

■ In the extraordinary circumstances of this case, I conclude that the proper remedy—the only just remedy—is the unconditional discharge of both Morales and Montalvo. Their convictions must be vacated and the District Attorney's Office precluded from re-trying them, for the following reasons. First, on the record before the Court, no reasonable jury could convict Morales or Montalvo of murder; indeed, the evidence strongly suggests that they are innocent. Second, Morales and

Montalvo have been severely prejudiced by the passage of time; they have "served extended and potentially unjustified periods of incarceration" and their ability to defend against the charges in any new trial has been hampered, at least in some respects. In addition, certain aspects of the District Attorney's Office's handling of this matter are troubling; this is yet another consideration weighing against permitting a re-trial.

**1.  *The Evidence***

The evidence of Morales's and Montalvo's guilt presented by the prosecution at trial was extremely thin. Only one eyewitness, Rodriguez, placed Morales at the scene, and only two eyewitnesses, Rodriguez and her son, implicated Montalvo.

This identification testimony was far from compelling. The son was only 11 years old at the time of the murder. He did not see the actual murder and testified only that Montalvo was present and grabbed him before the attack. Rodriguez was on the scene under circumstances that would have made it extremely difficult for her to identify anyone with any reasonable certainty. It was 11:00 at night in a park; she had been drinking; she then watched as her common-law husband was beaten and stabbed to death; and, by her own testimony, eight or nine or ten teenagers were on the scene, shouting and screaming. It would hardly be surprising if Rodriguez made a mistake when she identified Morales and Montalvo in line-ups some days later. *See Lyons v. Johnson,* 99 F.3d 499, 504 (2d Cir.1996) ("eyewitness testimony is often highly inaccurate"); *Kampshoff v.. Smith,* 698 F.2d 581, 585 (2d Cir. 1983) ("There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial."). Indeed, as noted, above, her testimony was inconsistent and flawed

in significant respects. In addition, Rodriguez's identification of Montalvo occurred in suggestive circumstances, as she was shown two photographs of Montalvo (in an isolated situation rather than as part of a photo array) approximately a week before the line-up.

The prosecution presented no other evidence to incriminate Morales and Montalvo. No forensic evidence was offered to tie Morales and Montalvo to the crime. The one fingerprint that was recovered was not a match for any of their prints. Despite all the individuals present, no other witnesses placed Morales or Montalvo at the scene.

On the other hand, the defense presented substantial evidence that Morales and Montalvo were not involved in the murder. At trial, Morales and Montalvo did not rely simply on the presumption of innocence and burden of proof, but instead they presented substantial evidence in their own defense.[1] Morales took the stand. Five alibi witnesses testified that he was at or near his home seven or eight blocks away at or about the time of the murder. Although four of the witnesses were friends or relatives of Morales, one of the witnesses was a neighbor who remembered yelling at Morales from her window shortly after 11 p.m. for throwing a lightbulb at her cat. Two alibi witnesses testified that Montalvo was with them and not at the scene of the crime. Another witness, who was actually present in the park at the time of the murder, testified that Morales and Montalvo were not there.

The prosecution's case has only become weaker. At a new trial, Rodriguez and her son would have to testify to events that occurred 14 years ago. In the meantime, Rodriguez has been convicted of at least one crime and was arrested several other times. The District Attorney's Office has not disclosed any new evidence of either petitioner's guilt.

In contrast, substantial additional exculpatory evidence is now available, including the statements of Jesus Fornes, Peter Ramirez, and Carlos Ocasio.

As discussed in detail in the Opinion, Fornes told Montalvo's mother, Morales's lawyer, Father Joseph Towle, and his own attorney, Stanley Cohen, that he committed the murder, with two others, and that Morales and Montalvo were not present. Fornes thus told four different people on four separate occasions under circumstances that provided considerable assurances of reliability that he was involved in the murder and that Morales and Montalvo were not.

The District Attorney's Office now concedes that Fornes made these statements, but it continues to maintain that Fornes was lying. Yet, the District Attorney's Office has offered no reasonable explanation for why Fornes would have lied to Montalvo's mother and Morales's lawyer when doing so would have subjected him to possible criminal prosecution, or why he would have lied to Father Towle or Stanley Cohen, when he believed that those conversations would be kept confidential. (See 7/16/01 Tr. at 163–64). No reasonable explanation could possibly exist, for it is clear that Fornes was *not* lying. He came

---

[1] Prior to trial, Morales and Montalvo surely acted as if they were innocent. Although no one was arrested at the scene, Morales appeared at a police precinct for questioning a few days later. He did so voluntarily and denied any involvement in the murder. Montalvo was not even a suspect; he accompanied Morales to a police precinct "[m]ore or less to give moral support to ... Morales." (Trial Tr. at 474–75). Morales was offered but rejected a plea bargain of one-and-a-half to three years, insisting instead on going to trial.

forward precisely because he felt guilty that Morales and Montalvo had been convicted of a crime that he, not they, had committed.[2]

The admissibility of the statements of Peter Ramirez must be reconsidered. Ramirez told his mother, Rosa Lorenzi, and his attorney, Donald Yeoman, that he had stabbed Rivera and that neither Morales nor Montalvo were present. Although the trial court's decision to exclude the statements was upheld by the state appellate courts as well as this Court, that ruling must be re-examined in light of the recent disclosures. While there are discrepancies between the details of what Ramirez told his mother and his lawyer, he was consistent in stating that he stabbed Rivera and that Morales and Montalvo were not present. These aspects of his statements are now corroborated by what Fornes told Father Towle, Stanley Cohen, and the others.

Finally, Ocasio is yet another eyewitness to the murder who states that he did not see either Morales or Montalvo at the scene of the crime. Taking his testimony in the light most favorable to the prosecution, he saw Montalvo and Morales at the pizzeria, but they were not part of Ramirez's group. They were still in the pizzeria when he left and Ramirez's group had already gone outside. When he returned to the park, he saw the murder and only Ramirez, Fornes, and another Carlos stabbed or struck Rivera. He corroborates Fornes's statements that Fornes, Ramirez, and a "Carlos" committed the crime, that a bat was used, and that Morales and Montalvo were not there. He did not see Morales or Montalvo in the park.

The District Attorney argues that all of this evidence should be presented to a new jury at a new trial. The new jury would be asked to sort out all this evidence and to make a determination as to what happened some 14 years ago. On this record, however, it is hard to imagine that any reasonable jury could convict.

### 2. The Prejudice to Petitioners

A second factor weighing against allowing a re-trial is the severe prejudice suf-

---

**2.** The only hint of a suggestion of a motivation for Fornes to lie to Morales's attorney was offered by the prosecution at a conference before the state court on April 28, 1989, when the Assistant District Attorney stated as follows:

I regard the alleged statement [of Fornes] as so highly tainted and suspicious as not to be worthy of belief.

It is clear to me—to give my analysis—that Mr. Fornes is likely a member of the Wolf[ ] Pack ....

... It would seem to me that just as Mr. Al[e]many may have been given some details when he came in as a last witness to testify, it is clear that members of the Morales family or crew gave Mr. Fornes certain details such as you have to mention a kid and a wife, even though there's no explanation as to where they went or where they came from.

You have to mention a Pat, you have to mention Peachy did it.

It is clear that he was given that information at the hearing. It would seem that he was pressured by Mr. Morales to come forward.

(4/13/89 Tr. at 160–61); see also Harris 8/20/01 Aff. in Morales, Ex. 8, at 2 (District Attorney's Office post-hearing memorandum, submitted in 1989, stating that "[w]hile the Fornes statement would seem to exculpate Morales, it is clear from Mr. Servino's testimony that Mr. Fornes may well have been coerced by Morales to come forward under the threat that Morales would name Fornes as one of the other perpetrators"). The notion is absurd. It makes no sense that Morales could have pressured Fornes into admitting the murder by threatening to implicate him in the murder. In addition, the suggestion that Morales "gave" Fornes the name of Peachy was extremely misleading, for the now-unredacted notes show that Fornes himself stated to one of the investigators that on the night in question he was with Peter, or "Peachy," Ramirez. (See Pittell Reply Aff. in Morales, Ex. G).

fered by Morales and Montalvo as a result of the passage of time. First, they have already served almost 13 years in prison, for a crime I do not believe they committed. They went to prison as teenagers and lost critical years of their lives.

Second, although they would now have additional evidence available to them at any new trial, their ability to defend against the charges has also been hampered in certain respects. Wilson Alemany is now deceased and is no longer available to testify. Donald Yeoman cannot be located. While the District Attorney's Office argues that their prior testimony can be read to the jury at a new trial, live testimony, of course, is significantly different from testimony read from a transcript. Moreover, witnesses who can be located will be required to recall events that occurred 14 years ago.

### 3. *The Actions of the District Attorney's Office*

An additional factor weighing against permitting a re-trial is the manner in which the District Attorney's Office has handled this matter.

A prosecutor's fundamental obligation is "to seek justice, not merely to obtain a conviction." *People v. Miller*, 149 A.D.2d 439, 539 N.Y.S.2d 782, 784 (2d Dep't 1989) (citations omitted). While all lawyers owe a duty of honesty and candor to the Court, "this obligation lies most heavily upon a District Attorney and Assistant District Attorneys who are not merely partisan advocates, but public officials charged with administering justice honestly, fairly and impartially." *People v. Heller*, 120 Misc.2d 85, 465 N.Y.S.2d 671, 674 (Kings Co.1983) (citing A.B.A. Prosecution Standards § 2.8(2)). As the Supreme Court has observed, the prosecutor's mandate:

is not that [he or she] shall win a case, but that justice shall be done .... [The prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

Here, I have no quarrel with the District Attorney's Office's initial decision to prosecute Morales and Montalvo. After all, one witness identified both Morales and Montalvo, a second witness identified Montalvo, a grand jury indicted them both, and a jury convicted. Hence, the initial decision to prosecute the two was reasonable.

The record, however, contains a number of troubling indications that the prosecution was more intent on protecting a conviction than in seeing that justice was done. For example:

• The record contains several indications that the responsible authorities did not sufficiently investigate the case back in 1987, 1988, and 1989. No one, for example, interviewed Ocasio. Fornes was interviewed, but only superficially, and there was no follow-up. Other eyewitnesses were not asked, apparently, to view photographs or line-ups. Even after Servino revealed his conversation with Fornes, the District Attorney's Office did not attempt to obtain a photograph of Fornes for use with possible witnesses. It did not do so even after the state court judge suggested showing a photograph of Fornes to the two eyewitnesses. (4/13/89 Tr. at 155, 157). Servino was a competent, credible attorney who had served as an Assistant District Attorney in the Westchester County District Attorney's Office for some 14 years, including approximately eight years as chief of the appeals bureau, before entering private practice in the summer of 1987. At the hearing on the motion for a new trial in 1989, he testified, on cross-exami-

nation by Assistant District Attorney Karen, that he had "no doubt" about the "veracity" of Fornes's statements to him. Surely, given what was at stake, the District Attorney's Office should have taken Servino's belief more seriously and investigated the matter more thoroughly.[3]

● Although the prosecutor learned just a few days before trial that criminal narcotics possession charges were pending against the principal witness, Jennifer Rodriguez, and that an active warrant was outstanding for her arrest, all indications are that the prosecutor failed to disclose the information to defense counsel. Moreover, knowing that drug possession charges were pending against Rodriguez, the prosecutor remained silent on cross-examination when the witness denied ever using "heroin or cocaine or anything like that." (Trial Tr. at 167).

● From the outset, the District Attorney's Office continually pressed the point that Morales was a member of a street gang called the Wolf Pack, as if that were proof that he had participated in the murder. For example, the victim's sister, Aurelia Betances, was called as a defense witness solely to answer questions regarding the manner in which photographs of Montalvo were shown to Rodriguez. Yet, on cross-examination, the Assistant District Attorney sought to elicit information about the Wolf Pack:

Q.  Why did you bring those pictures to the precinct?

MR. GERSTEN: Objection, hearsay.

THE COURT: Overruled.

A.  Because they belong to the gang.

Q.  What gang is that?

MR. GERSTEIN: Objection.

THE COURT: Sustained.

Q.  Do you know of a group known as the Wolf Pack?

MR. GERSTEN: Judge, objection, Judge.

THE COURT: Sustained. It is way beyond the scope of direct.

MR. KAREN: In that case I'll adopt this witness as my own.

Q.  Prior to September 27, 1987 did you know of a group called the Wolf Pack?

THE COURT: Come up please.

(Trial Tr. at 427). This questioning was patently improper, as the prosecutor continued to ask the question even as the court sustained defense counsel's objections. Some 13 years later, in papers in opposition to Morales's CPL § 440.10 motion, the same prosecutor continued to make the same largely gratuitous point:

On June 18, 2001, I personally interviewed Reverend Joseph Towle in the Bronx District Attorney's Office. He informed me that he had been the parish priest for defendants Jose Morales and Ruben Montalvo, and for Jesus Fornes, *all of whom were members of a "Savage Skulls" type street gang known as "The Wolfpack."*

(Harris 8/20/01 Aff. in *Morales,* Ex. 31, Mem. at 8) (emphasis added).

● Morales's attorney served her Second Circuit brief and appendix on the District Attorney's Office on August 31, 2000. The appendix contained the affidavit of Father Joseph Towle, which described his conversation with Jesus Fornes. Hence, at that point the District Attorney's Office was presented with evidence that two young

---

**3.**  Ironically, as early as October 1987, when Ramirez was arraigned, a judge was urging the District Attorney's Office "to look at this matter seriously." (10/15/87 Tr. at 8); *see also id.* (in setting bail at $5,000, Justice Burton Roberts commented: "I would suggest that the People have a duty to investigate an allegation of this seriousness where an individual is 15 years of age.").

men had been wrongfully convicted and had been in prison for some 12 years for a crime they did not commit. Moreover, the evidence corroborated the testimony that Servino had given at the hearing in 1989. Yet, the District Attorney's Office made no effort to interview Father Towle until after June 8, 2001, when I conferenced the case and expressed concern that Father Towle had not been interviewed yet. (6/8/01 Tr. at 11). The District Attorney's Office finally interviewed Father Towle on June 18, 2001—some 10 months after being provided with the affidavit.

● The District Attorney has argued that the statements of Fornes are not to be believed because the evidence showed that seven to eleven individuals were involved in the murder while Fornes only identified three individuals and also because Fornes stated that a bat was used when no bat was recovered on the scene. Of course, it is possible that a bat was used and that someone fled with it. It is also possible, and likely the case, that three individuals were principally involved while others provided support. What is disingenuous about the District Attorney's arguments, however, is the fact that early on in the investigation witnesses, including Jennifer Rodriguez, told the investigators that three Hispanic males were involved and that bats were used. (*See* Maher Aff. in *Morales*, Exs. A, C; *see also* Trial Tr. at 16 (Cesar Montalvo testifying to presence of bats)).

● On April 17, 2001, after this case was remanded by the Second Circuit, Morales, acting *pro se*, filed a CPL § 440.10 motion in the state court to vacate his conviction. The District Attorney's Office opposed the motion with extremely strong language, arguing that the motion should be "summarily denied in its entirety, as [the] claims are procedurally barred and totally without merit." Notwithstanding this ini-

tial response, the District Attorney's Office now concedes that the convictions must be vacated.

● The transcript of the interview of Carlos Ocasio shows that the District Attorney's office was more interested in obtaining answers that would incriminate Morales and Montalvo than in obtaining the truth. For example, when Ocasio answered that he did *not* recall seeing "Ruben" in the pizzeria, the prosecutor immediately followed by asking: "Did you say Ruben was in the pizza shop?" In addition, the Assistant District Attorney asked Ocasio five times whether he saw where Morales and Montalvo went after the pizzeria; although Ocasio unequivocally stated the first three times that he did not see them after he left the pizzeria, the prosecutor kept pressing until Ocasio gave an arguably ambiguous response: he did not see them, but it was possible they were there.

Prosecutors wield great power. As a consequence, they must exercise that power responsibly. Here, I have no doubt that the prosecutors acted in good faith in the sense that they undoubtedly believed that Morales and Montalvo were guilty. But had they wielded their power more responsibly, particularly after Fornes came forward and spoke to Servino, two apparently innocent men probably would not have spent more than a decade in prison. Under these circumstances, as well as the other circumstances discussed above, a re-trial would not serve the interests of justice.

### CONCLUSION

Accordingly, the petitions are granted unconditionally. Morales and Montalvo are hereby granted an unconditional discharge and the Bronx District Attorney's Office is hereby barred from re-trying Morales or Montalvo for the murder of

Jose Antonio Rivera. Their convictions are vacated and the Bronx District Attorney's Office is ordered to take whatever steps are necessary to restore Morales and Montalvo to the status they were in prior to their arrest and prosecution in the underlying murder case. These steps shall include expungement of the convictions and all references to them in the public record.

Counsel for petitioners shall submit proposed judgments, on notice, within five business days hereof.

SO ORDERED.